Ed Anthony **WAGNER**, Appellant,

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

Supreme Court of Kentucky.

May 1, 1979.

Terrence R. Fitzgerald, Daniel T. Goyette, Donald E. Dawson, Louisville, for appellant.

Robert F. Stephens, Atty. Gen., Patrick B. Kimberlin, III, Asst. Atty. Gen., Frankfort, for appellee.

LUKOWSKY, Justice.

Wagner was convicted of first-degree rape, KRS 510.040 and third-degree assault, KRS 508.030. The jury fixed his punishment at fifteen years in the penitentiary for rape and at one year in the county jail for assault. The indictment also charged that he was a first-degree persistent felony offender, KRS 532.080(3). In order to settle this issue the second stage of a bifurcated trial required by KRS 532.080(1) was held. The jury found Wagner to be a first-degree persistent felony offender and, consequently, enhanced his punishment to life imprisonment. He appeals. We reverse and remand.

The case for the prosecution may be summarized as follows:

At approximately 3:30 on the afternoon of January 26, 1978, Amy Morrison was waiting for a bus at the corner of Fourth and Chestnut Streets in Louisville to take her to work at Suburban Hospital. A car drove by and stopped. Wagner got out of the car, approached her, and told her that he was from the Courier-Journal and wanted to ask her some questions about her work and the bad weather. Wagner told her that he was on his way to St. Matthews and offered her a ride to Suburban Hospital. Amy accepted because Wagner appeared to be a nice man and because of the frigid weather conditions in which she had been waiting for her bus.

After they got in Wagner's car he drove down Bardstown Road where he stopped, in an alley near an overpass, and asked Amy if she would mind waiting while he attempted to get a check cashed by a friend. She had no objection. Wagner left but was gone only a few minutes. He told her that his friend wasn't home but would be back at 4 p. m. and again requested that they wait. While they waited Wagner gave her a candy bar and they talked on his C–B radio.

Wagner suddenly pulled out a knife and placed it at Amy's throat. He told her "Don't move or I'll slit your throat." She was surprised at this and jumped. The knife cut her finger. He tied her hands behind her back with a scarf which had been hanging from his rear view mirror. He took another scarf and tied one end around her throat and the other end to the scarf holding her hands. He told her not to struggle or she would choke herself to death. He made her lie down on the front seat of the car and as he kissed her he pulled up her shirt and placed the knife on her stomach indicating that it would be within easy reached if he needed it.

He demanded that she shut her eyes and after she did so he placed a gluey substance

on them. This substance sealed her right eye shut and she could barely open her left eye. He kissed her breasts and at approximately 4:30 p. m. he drove Amy to a house near the Cherokee Park area of Louisville where he had a rented room. He took Amy to his room and during the course of the next 2 and ½ hours he raped her twice.

Amy assured Wagner that she would not tell anyone about the incident and was able to persuade him to take her some place where she could remove the gluey substance from her eyes. He drove her to a Convenient Food Mart located at Fourth and Oak Streets. He got out of the car, left his keys in the ignition and went inside to purchase something that would help her cleanse her eyes. After he entered the store she took the car keys, jumped out of the automobile and hurried into the store. Once inside she accused Wagner of raping her and began crying. He denied this, demanded his keys and apparently attempted to leave the store but some of the customers in the store crowded around the exit and refused to let him leave until the police arrived.

When the police arrived they interviewed both Amy and Wagner. They accompanied Wagner and Amy to Wagner's car and permitted him to lock and secure the car. While this was being done Amy pointed through the windows to the scarves and to a spot on the upholstery which she said was blood from her cut. They took Amy to General Hospital for an examination and Wagner accompanied them to police headquarters for questioning. During the questioning the police had Wagner's car removed to police headquarters. At the conclusion of the questioning the police formally arrested Wagner for the crimes of rape and assault. After the arrest the police conducted an "inventory" search of Wagner's car for the purpose of "looking for evidence."

The case for the defense may be summarized as follows:

Amy flagged Wagner down as he was driving past the bus stop in his car. She had a small cut on her hand and asked him to take her to Suburban Hospital where she worked. During the trip she offered to have intercourse with him for ten dollars. She gave Wagner some kind of pill and he accepted the offer. He took her to his apartment where they had sexual relations. During her stay in the apartment Amy went into the bathroom to put on her false eyelashes. Her eyelids became stuck together when she put them on and she asked him to take her to a store to obtain something to unstick them. Wagner then took her to the Convenient Food Mart to purchase something to clean her eyelids and to obtain change for a twenty dollar bill so he could pay her. She then demanded fifty dollars and they argued about the price. This argument resulted in Amy's entering the store and accusing Wagner of rape.

■ Prior to trial Wagner moved the court for an order directed to Our Lady of Peace Hospital authorizing him to examine all psychiatric records pertaining to Amy. This motion was denied and properly so. The perimeter of pretrial discovery in a criminal case is established by RCr 7.24(1) and (2). The only materials discoverable under the rule are those within the possession, custody and control of the Commonwealth. The records of a private, charitable hospital certainly are not encompassed within the boundaries fixed by this rule.

■ At trial the Court refused to permit Wagner to cross-examine Amy about her psychiatric history. In an avowal he was able to establish that Amy had been committed to a psychiatric hospital prior to the events in issue for attempted suicide, severe depression and drug abuse, and that she was presently under psychiatric care and was receiving shock treatments which were affecting her memory. The proffered testimony was relevant and competent and should have been received because it tends to impeach Amy's credibility. In a swearing match such as this the weight to be given to the testimony of the prosecuting witness is a crucial issue. Consequently, the exclusion of this evidence requires reversal and a new trial. See *Mosley v. Commonwealth*, Ky., 420 S.W.2d 679 (1967); Anno., Witnesses—Mental State or Condition, 44 ALR 3rd 1203 (1972).

Wagner insists that the fruits of the warrantless search of his automobile hours after its impoundment on the parking lot of the Convenient Food Mart and its removal to the police station should have been suppressed. He maintains that this search violated his rights under both the Fourth Amendment of the Constitution of the United States and Section 10 of the Constitution of the Commonwealth of Kentucky. We thought that in *City of Danville v. Dawson*, Ky., 528 S.W.2d 687 (1975), we laid to rest the circumstances under which motor vehicles could be impounded and their interiors searched or inventoried. Such is not the case because the Supreme Court of the United States has since decided *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and because our language in *City of Danville v. Dawson*, supra, failed to make it perfectly clear that we were interpreting Section 10 of our constitution as well as the Fourth Amendment of the federal constitution. To eliminate this confusion we now find it necessary to restate our views and rest our holding solely upon Section 10 of our constitution.[1]

A vehicle may be impounded without a warrant in only four situations:

1. The owner or permissive user consents to the impoundment;

2. The vehicle, if not removed, constitutes a danger to other persons or property or the public safety[2] and the owner or permissive user cannot reasonably arrange for alternate means of removal;

3. The police have probable cause to believe both that the vehicle constitutes an instrumentality or fruit of a crime and that absent immediate impoundment the vehicle will be removed by a third party;[3] or

4. The police have probable cause to believe both that the vehicle contains evidence of a crime and that absent immediate impoundment the evidence will be lost or destroyed.[4]

So long as the only potential danger that might ensue from non-impoundment is danger to the safety of the vehicle and its contents no public interest exists to justify impoundment of the vehicle without the consent of its owner or permissive user. Because the vehicle is legally in his custody the driver, even though in police custody, is competent to decide whether to park the vehicle in a "bad" neighborhood and risk damage through vandalism or allow the police to take custody. Only when the vehicle if not removed poses a danger to other persons, property or the public safety does there exist a public interest to justify impoundment if the owner or permissive user is unable to reasonably arrange for a third party to provide for the vehicle's removal. *City of Danville v. Dawson*, supra at 690–691.

The more difficult question is the legality of a routine police inventory of a vehicle subsequent to a lawful impoundment. Mere legal custody of an automobile by law enforcement officials does not automatically create a right to rummage about its interior.[5] A routine police inventory of

1. *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) (a state constitution may impose a more stringent standard than the federal constitution).

2. An illegally parked vehicle would constitute a danger to public safety under this exception to the warrant requirement and could be lawfully impounded.

3. See, e. g., *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000, *on remand, State v. Opperman*, S.D., 247 N.W.2d 673 (1976) (inventory of the contents of an illegally parked car after it was impounded held to violate the state constitution); *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209

(1975), *reh. denied,* 423 U.S. 1081, 96 S.Ct. 869, 47 L.Ed.2d 91 (1976); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, *reh. denied,* 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, *reh. denied,* 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94 (1970); *State v. Cress*, Me., 344 A.2d 57, 62–64 (1975).

4. See note 3, supra.

5. See, e. g., *Mozzetti v. Superior Court*, 4 Cal.3d 699, 94 Cal.Rptr. 412, 484 P.2d 84 (1971); *State v. Bradshaw*, 41 Ohio App.2d 48, 322 N.E.2d 311 (1974).

the contents of an impounded vehicle constitutes a substantial invasion of the zone of privacy of its owner or permissive user. It is an invasion additional to the intrusion upon his privacy interests occasioned by the impoundment itself. Consequently, such an inventory is impermissible unless the owner or permissive user consents or substantial necessities grounded upon public safety justify the search.

■■ If a vehicle is legally impounded and its owner or permissive user is present or otherwise known at the time the vehicle is seized no such need is ordinarily manifest. If the owner or permissive user does not consent to the routine inventory he will assume the risk that items obtained in the vehicle will be lost or stolen. The police in such a case merely lock up the vehicle and leave it in place until the owner or permissive user makes suitable arrangements for its removal. Concomitant with this right to prevent a routine inventory is the owner's or permissive user's right to have a representative present during any inventory that is authorized and his right to limit the inventory to only specific portions of the vehicle.

■■ If the police have probable cause to believe that the vehicle contains evidence or constitutes a fruit or instrumentality of a crime they must procure a warrant in order to conduct a search in the absence of the consent of the owner or permissive user. In such a case the police can prevent the removal of the vehicle until a reasonable time has elapsed in which a warrant can be secured. Because the vehicle is in police custody there is no danger that any evidence it contains will be lost or stolen and hence no necessity to depart from the warrant requirement. If a warrant cannot be obtained no inventory can be undertaken unless the owner or permissive user consents. In this case the owner-driver of the seized vehicle was at police headquarters at the time of impoundment. Because neither a search warrant nor his consent was obtained prior to the routine inventory search for evidence rummaging through the interior of the car constituted an illegal search even though the car had been lawfully impounded. The evidence uncovered by the illegal activities of the police will be suppressed and not used at the new trial.[6]

A determination of the circumstances which would justify an inventory of a lawfully impounded vehicle whose owner or permissive user is not present or whose owner or permissive user may not be reasonably contacted at the time the impoundment is a matter which we reserve until we are presented with a case which squarely presents the issue.

■ During the persistent felony offender stage of the bifurcated trial Wagner sought to introduce into evidence before the jury prior lunacy adjudications as a defense to the persistent felony offender charge. The trial court refused to permit the introduction of this evidence. The trial court quite correctly found that these lunacy adjudications were completely irrelevant to the factual issues which would have to be answered by the jury at the persistent felony offender stage of the trial, KRS 532.-080(1) and (2). The only relevance which these lunacy adjudications could have had at the persistent felony offender stage of the trial could have been as a justification for the trial judge to refuse to submit the prior felony convictions to the jury on the basis that they were void because Wagner was convicted while he was incompetent to stand trial. Unfortunately for Wagner that issue was conclusively determined against him in *Wagner v. Commonwealth*, Ky., 379 S.W.2d 731 (1964).

■ Before the persistent felony offender issues were submitted to the jury Wagner requested that the trial court instruct the jury on the presumption of innocence. The request was denied. He neither received nor requested such an instruc-

---

**6.** *Youman v. Commonwealth,* 189 Ky. 152, 244 S.W. 860 (1920). This would not include the alleged blood stain or the scarves because they were in plain view of the police officers at the time the car was closed and locked. *City of Danville v. Dawson,* supra at 691.

tion at the first phase of the bifurcated trial at which the issue of guilt or innocence was determined. RCr 9.56 now requires that such an instruction be given at the guilt stage of every trial. Because this case will be tried again and this instruction will be given in accord with the rule at the guilt stage of the trial we see no reason to agonize over Wagner's submission. Suffice it to say that if the instruction is given at the guilt stage of the trial it need not be repeated at the persistent felony offender stage.

Wagner's remaining assignment of error is patently without merit and need not be discussed.

The judgment is reversed and the cause is remanded to the Jefferson Circuit Court for a new trial.

All concur except CLAYTON and STEPHENSON, JJ., who dissent.

STEPHENSON, Justice, dissenting.

I am unwilling to agree with any enlargement of Fourth Amendment rights over and above the minimum standards prescribed by the United States Supreme Court.

The present state of the law of Fourth Amendment rights is already too complicated. The majority opinion promulgates yet another set of rules or standards to further complicate this field of law.

CLAYTON, Justice, dissenting.

I respectfully dissent from that part of the majority opinion regarding the search of appellant's automobile. I see no reason why § 10 of the Kentucky Constitution should be interpreted so as to impose a more stringent standard than the Fourth Amendment of the Federal Constitution.