Argued and submitted January 25, remanded with instructions
September 25, 1984

## STATE OF OREGON,
*Petitioner on review,*

*v.*

## JAMES HENRY ATKINSON,
*Respondent on review.*

(CA A22274; SC S30071)

688 P2d 832

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the petition and brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

John Daugirda, Deputy Public Defender, Salem, argued the cause for respondent on review. With him on the brief was Gary D. Babcock, Public Defender, Salem.

PETERSON, C. J.

**PETERSON, C. J.**

The issue in this case is whether a police inventory of the contents of an impounded automobile without a search warrant violated defendant's right to be secure against unreasonable searches and seizures as guaranteed by the state and federal constitutions.[1]

I

A person called the police during early morning hours to report a man acting suspiciously in the neighborhood. The police patrolled the neighborhood and found an unattended car the suspect may have been driving. With some police remaining at the car, others continued to check the area in an attempt to find the suspect. In addition, unsuccessful efforts were made to contact the car's owner to retrieve the vehicle prior to having it towed away.

After approximately three and one-half hours, the car was "impounded" and towed to a locked police storage shed until it could be inventoried.

A few hours later, the police "inventoried" the car, that is, an officer went through the car's interior, including looking under the seats and into the unlocked glove compartment, but not the locked trunk,[2] and prepared a detailed list of items in the vehicle. At the completion of the inventory, the items were left in the car. The officer testified that the inventory was conducted in accordance with Polk County

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment of the federal constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] The keys to the trunk were available. They had been left in the unlocked car. The officer opened the trunk and looked in but did not inventory or further investigate the trunk because he became concerned about the legality of going into a locked compartment.

Sheriff's Department policy. When asked whether he had been told prior to taking the inventory that the automobile had been seized because it was suspected of being involved in a burglary, the officer who performed the "inventory" of the contents of the vehicle said he had. He also testified that he was "looking for evidence of a crime" while carrying out the standard inventory practice of the department. In the course of the inventory, the inventorying officer opened the unlocked glove compartment and found items which may link defendant to burglaries in the area, items which are the subject of defendant's motion to suppress.

Originally, the state appealed an order allowing, in part, the defendant's motion to suppress. The defendant cross-appealed from the order denying other parts of his motion to suppress. ORS 138.040. The Court of Appeals reversed and remanded with instructions to suppress a map and bottle found on examining the glove compartment of the defendant's car, stating that the inventory of the glove compartment exceeded what we found permissible under Article I, section 9, of the Oregon Constitution in *State v. Keller,* 265 Or 622, 510 P2d 568 (1973). Four judges specially concurring rejected *Keller's* application to the case but reached the same result based on *State v. Lowry,* 295 Or 337, 667 P2d 996 (1983). Two dissenters contended that *State v. Keller, supra,* does not preclude the inventory of a glove compartment and would affirm the trial court under *South Dakota v. Opperman,* 428 US 364, 96 S Ct 3092, 49 L Ed 2d 1000 (1976).

II

The overall principle repeatedly stated in this court and the Supreme Court of the United States is that "[e]xcept in a few carefully defined classes of cases, a search of private property without valid consent is 'unreasonable' unless it has been authorized by a valid search warrant." *South Dakota v. Opperman, supra,* 428 US at 381 (Powell, J., concurring); *See also State v. Greene,* 285 Or 337, 340-41, 591 P2d 1362 (1979). Under the federal constitution, cases of noninvestigatory inventories of the contents of impounded automobiles have been held to be one of those excepted classes.

The only prior pronouncement by this court that touches on an inventory of an automobile apparently assumed that no search warrant is required to inventory the contents of

a lawfully impounded vehicle. *State v. Keller,* 265 Or 622, 629, 510 P2d 568 (1973). In *Keller,* this court distinguished the search of a fishing tackle box within a vehicle from a general inventory of the vehicle, holding the former invalid and stating that "there is a delicate balance between conflicting public and private interests — the need to search to protect law officers and car owners and the invasion of Fourth Amendment protected interests of private citizens." 265 Or at 629.

Until today, this court has not further considered inventories of lawfully impounded vehicles. The Court of Appeals has held that when an automobile is lawfully impounded, the impounding officer may enter the vehicle and conduct an inventory of personal property. *State v. Weeks,* 29 Or App 351, 355, 563 P2d 760 (1977). In *State v. Crosby,* 35 Or App 617, 582 P2d 40 (1979), the Court of Appeals concluded that the locked trunk of a car was within the proper scope of an inventory. 35 Or App at 622.

The Supreme Court of the United States has reached the same result. In *South Dakota v. Opperman, supra,* the Supreme Court held that noninvestigative police inventories of automobiles lawfully within governmental custody are constitutional and not subject to the warrant requirement of the Fourth Amendment. The court concluded that the non-criminal context of inventories and the inapplicability in such a setting of the requirement of probable cause obviate the requirement of search warrants.

"With respect to noninvestigative police inventories of automobiles lawfully within governmental custody, however, the policies underlying the warrant requirement * * * are inapplicable." *Opperman, supra,* 428 US at 370 n 5.

The court concluded that the Fourth Amendment permits a routine police inventory of the closed glove compartment of a locked automobile impounded for ordinary parking violations.[3] In a separate concurring opinion, Justice Powell further explained why routine inventories should not be conditioned on warrants issued by a judicial officer.

---

[3] Distinguishing characteristics in the case at bar are that the automobile was unlocked, the keys were under the front seat, and the vehicle was seized after an unsuccessful neighborhood search to find the car's owner. The lawfulness of the impoundment of the automobile in this case is not challenged.

"Inventory searches * * * are not conducted in order to discover evidence of crime. The officer does not make a discretionary determination to search based on a judgment that certain conditions are present. Inventory searches are conducted in accordance with established police department rules or policy and occur whenever an automobile is seized. There are thus no special facts for a neutral magistrate to evaluate." *South Dakota v. Opperman, supra,* 428 US at 383.

In a recent opinion, *Illinois v. LaFayette,* 462 US 640, 103 S Ct 2605, 77 L Ed 2d 65 (1983), the Supreme Court of the United States further explained the Fourth Amendment's constraint on police administrative methods.

"* * * In *South Dakota v. Opperman, supra,* * * * [w]e found no need to consider the existence of less intrusive means of protecting the police and the property in their custody — such as locking the car and impounding it in safe storage under guard. * * * [T]he real question is not what 'could have been achieved,' but whether the Fourth Amendment requires such steps; it is not our function to write a manual on administering routine, neutral procedures of the station house. Our role is to assure against violations of the Constitution.

"* * * We are hardly in a position to second guess police departments as to what practical administrative method will best deter theft by and false claims against its employees and preserve the security of the station house." *Illinois v. LaFayette,* 462 US 640, 103 S Ct 2605, 77 L Ed 2d 65, 71-72 (1983).

## III

Like the Supreme Court of the United States, we are a judicial, not a legislative body. It is not our function to decide as a matter of policy how, and for what purpose, automobiles or other private property that come into official custody should be examined. That is a matter for politically accountable officials to decide by laws, ordinances, or delegations of rulemaking authority. Our role, as the Supreme Court said in *Illinois v. LaFayette, supra,* is to assure that such policies and procedures as are adopted do not violate constitutional guarantees.

The Oregon legislature could adopt a uniform standard for dealing with the contents of impounded vehicles, but it has not done so, possibly because different procedures might

be appropriate for various circumstances in different communities throughout the state. For instance, a requirement that police attempt to contact the owner of each impounded vehicle before undertaking an inventory might presuppose that all law enforcement agencies have a uniform capability that may or may not exist. Nor are we told whether Polk County has adopted an official policy for dealing with impounded vehicles and their contents. Although, for instance, rolling up the windows and locking the car might be less intrusive than an inventory of its contents, the only issue before us is whether this is the only policy allowed by Article I, section 9, of the Oregon Constitution. We hold that it is not. Rather, we hold that a policy may be adopted and uniformly administered to inventory the contents of ordinary vehicles in order to protect private property and for ancillary purposes under conditions set forth below.

Three principal purposes often are put forward to justify a governmental policy of inventorying impounded personal property.

First, it is asserted that inventories protect the owner's property while in police custody. Once an adequate inventory has been made, the police can take appropriate action to safeguard the contents, as necessary. Theft and vandalism are prevented or reduced. There is a substantial gain in security if contents are inventoried and valuable items removed for storage. *See, e.g., United States v. Mitchell,* 458 F2d 960, 961 (9th Cir 1972).

Second, it is asserted that inventories reduce and tend to prevent the assertion of false claims against police. Even though the inventory is not a completely effective means of preventing such claims (because items can be taken before the inventory or the inventory can itself be falsified), the existence of the practice tends to discourage the fraudulent assertion of claims for lost or stolen property. *See, e.g., United States v. Kelehar,* 470 F2d 176, 178 (5th Cir 1972).

Third, it is asserted that in an age of increasing violence, some danger to police and others arises from the impoundment of uninventoried property. This danger, in the occasional case, is great and is of sufficient magnitude to be considered. *See, e.g., Cardenas v. Pitchess,* 506 F2d 1224 (9th Cir 1974) (vehicle owner's affiliation with group suspected of

bombing justified inventory for safety of police). *Accord South Dakota v. Opperman, supra,* 428 US at 378 (Powell, J., concurring). Reliance on this reason must have a concrete basis in specific circumstances; it may not simply be assumed as a basis of a general precautionary practice.

If the responsible policy makers decide that protective reasons of this nature justify prescribed procedures for inventorying the contents of an impounded vehicle, such a policy is not inherently "unreasonable" within the meaning of Article I, section 9, if it complies with the following conditions:

A.  The vehicle must be lawfully impounded. For various reasons of public necessity, it is sometimes necessary that automobiles be taken into governmental custody. Lawful impoundment of a vehicle is a necessary prerequisite to an inventory of its contents by the government or its agents. *See generally Dyke v. Taylor Implement Mfg. Co.,* 391 US 216, 88 S Ct 1472, 20 L Ed 2d 538 (1968).

There are occasions when state officials (such as police officers, agriculture inspectors, health and safety inspectors) have an administrative or civil duty, authority or responsibility to take custody of personal property. When governmental authorities have lawful "administrative" custody of personal property, then they may take a series of reasonable steps which, depending upon the purpose of the custody, can include a detailed "inventory" of the property's contents. In such a context there is no "search" for predictable "things to be seized" that could be "particularly described," as the warrant requirement of Article I, section 9, contemplates. The requirement fits such a purely protective inventory less than the kinds of inspections involved in *Marshall v. Barlow's, Inc.,* 436 US 307, 98 S Ct 1816, 56 L Ed 2d 305 (1978) (inspection of business premises under the Occupational Safety and Health Act) or *Camara v. Municipal Court,* 387 US 523, 87 S Ct 1727, 18 L Ed 2d 930 (1967) (health or safety inspections of private residences), which are directed at finding evidence of compliance or noncompliance with governmental regulations. No such enforcement purpose is involved in such possible reasons for inventories as we have discussed.

■    Whenever police officers obtain custody of private property for reasons other than by consent or seizure under a

warrant or incident to a lawful arrest or exigent circumstances, the first step is to determine the source of the authority for the custody. If the government agents had no authority to take custody of the property, then there can be no lawful intrusion into it. The inquiry ends there. Some examples will illustrate the point.

ORS 483.351 *et seq,* authorizes police officers to take custody of "abandoned" vehicles. The statute also authorizes a lien on the vehicle *and its contents* to pay storage and towing charges. The police may then dispose of both the vehicle and its contents. Because of the broad statutory authority conferred, a detailed inventory of the contents of the vehicle in preparation for its sale would be permitted. These sections specifically do not apply to "any criminal investigation." ORS 483.365. For abandoned boats, see ORS 488.655 *et seq.*

Similarly, under ORS 133.663, if the possessory rights in items seized are disputed, the court may "impound" the items seized, give notice and hold a hearing to determine their ownership. Whenever the court "impounds" items seized pursuant to statutes such as this, a full inventory of their contents is permissible, subject to the conditions discussed in part B, below.

By contrast, where government officials are allowed only limited authority to take temporary control of personal property — such as to move an automobile after a traffic accident — the officers' authority does not extend to conducting a general inventory of the automobile's contents.[4] However, if statutes, ordinances, or other laws provide that

---

[4] It has been held that a limited "search" of property is permissible even though the property was not impounded or in the custody of law enforcement officers at the time. *See, e.g., US v. Miller,* 589 F2d 1117, 1125 (1st Cir) *cert denied* 440 US 958, 99 S Ct 1499, 59 L Ed 2d 771 (1979) (where a boat of unknown origin had been abandoned at a mooring belonging to another person, fouled in its lines, and where the circumstances justified a reasonable fear of a drowning, the combination of "community caretaking functions" and possibly exigent circumstances amply justified intruding upon the limited privacy expectations surrounding the abandoned vessel in order to determine the boat's ownership and the safety of its mariners); *Evans v. State,* 364 So 2d 93, 94 (Fla App 1978), *cert denied* 373 So 2d 457 (Fla 1979) (highway patrolman who observed driver pull her car off road and stop but was unable to gain her attention upon approaching vehicle although the officer observed that her eyes were open, was justified in gaining entry to car and examining driver's pocketbook to inspect her license for identifying device which would delineate a medical disability that could account for driver's condition before rescue unit which he summoned arrived).

overparked cars be "impounded," inventories of the contents of cars so impounded also may lawfully be authorized, including inspection and inventorying the contents of unlocked glove or trunk compartments and open containers as set forth in part II B, below. The justifications offered for inventories are important considerations whenever full custody of personal property is authorized.

B.   If the vehicle is in lawful administrative custody, any inventory must be conducted pursuant to a properly authorized administrative program, designed and systematically administered so that the inventory involves no exercise of discretion by the law enforcement person directing or taking the inventory. *See generally State v. Tourtillott,* 289 Or 845, 860, 618 P2d 423 (1980); *see also South Dakota v. Opperman, supra,* 428 US at 383 (Powell, J., concurring).

If the evidence shows that the inventory deviated from the established policy or procedures of the particular law enforcement agency, the inventory should be deemed invalid. The scope of the inventory must be limited to that — an inventory. Objects found within the inventoried vehicle should be scrutinized only to the extent necessary to complete the inventory.[5]

The degree to which an inventorying officer may scrutinize the items uncovered is limited. *See State v. Perry,* 298 Or 21, 688 P2d 827 (1984), decided this day. *See also State v. Keller, supra,* where we held that police conducting an inventory of an automobile "pursuant to administrative requirements" (265 Or at 624) could not open a fishing tackle box which was secured with wire tied around it, but would be required to inventory only the container as "one fishing tackle box." 265 Or at 626, 629. In *Opperman,* the police, when they

---

[5]
"What is needed in the vehicle inventory context, then, as is true of many other types of regulatory searches, is not probable cause but rather a regularized set of procedures which adequately guard against arbitratriness." 2 W. LaFave, Search and Seizure 576 (1978).

"A locally followed practice gives some assurance that a particular car was not singled out for special searching attention. Absent some such assurance, some special reason for the taking of safeguarding or security precautions that are not customarily taken should exist if the intrusion resulting from the taking of such precautions is to be rendered reasonable under the Fourth Amendment." *United States v. Hellman,* 556 F2d 442, 444 (9th Cir 1977).

inventoried the glove compartment, found in addition to marijuana, "miscellaneous papers" (a checkbook, an installment loan book, and a social security status card) which they removed without examination. The *Opperman* opinion indicates that a majority of the Supreme Court of the United States would not approve of examining such documents as a part of the routine vehicle inventory process. Justice Powell emphasized that approval of the inventory in that case "provides no general license for the police to examine all the contents of such automobiles." *South Dakota v. Opperman, supra,* 428 US at 380 (Powell, J., concurring). *See also* 2 W. LaFave, Search and Seizure 580-81 (1978).

## IV

■        From the briefs and the record provided in this case we cannot reach a conclusion whether this inventory is permitted by Article I, section 9, of the Oregon Constitution under the above analysis.

Apparently the parties and the court assumed that the vehicle was lawfully impounded. However, as a prerequisite to a lawful inventory, a determination as to the authority under which the police impounded the vehicle is necessary.

■        It is unclear whether this inventory was conducted pursuant to a properly authorized program designed and systematically administered to achieve the stated purpose. However, the trial judge made no such finding.[6] There also is evidence that the officer was "looking for evidence of a crime."[7]

Finally, it remains unclear whether this inventory was within the scope permissible under Article I, section 9, of the Oregon Constitution. The evidence was found in the glove compartment of defendant's car. The contents of a glove box

---

[6] The inventorying officer testified that the Polk County Sheriff's policy is that "every vehicle that is towed into the Polk County impound lot or impound area will be inventoried. * * * My purpose, sole purpose, was to inventory the vehicle per instructions. * * * The point is, we are required by our department policy to make notes, accurate notes of all the items in the vehicle that we inventory in impound."

[7] If initial impoundment is valid under the rules stated in the text of this opinion, and if an inventory is conducted pursuant to and consistent with a properly authorized administrative program, that is, the inventory would be conducted in any event, the fact that the officer also looks for evidence of criminal activity would not invalidate the inventory. *See State v. Tourtillott,* 289 Or 845, 868, 618 P2d 423 (1980).

are within the permissible scope of an authorized inventory. However, there was some testimony as to the scrutinizing of a map and a newspaper that suggests the officer possibly exceeded the permissible scope of the noninvestigatory inventory in a "search" for evidence. *Compare United States v. Turk,* 526 F2d 654 (5th Cir) *cert denied* 429 US 823, 97 S Ct 74, 50 L Ed 2d 84 (1976) (none of valid objectives of inventory search require officers to play cassette tapes found in vehicle).

Therefore, this case is remanded to the trial court for further proceedings consistent with this opinion.

Remanded to the trial court.

**ROBERTS, J.,** dissenting.

"Impoundment" and "inventory search" are among a number of shorthand phrases that recur with regularity in judicial decisions. *See State v. Hansen,* 295 Or 78, 664 P2d 1095 (1983) and *State v. Matsen/Wilson,* 287 Or 581, 601 P2d 784 (1979), describing "freezing" or "securing" a premises. Repeated use of these terms without explanation may make it appear as though such phrases carry a legal significance. They do not. They are labels used in place of describing behavior in which government officials may engage in particular circumstances. An "impoundment" may occur when officials take possession of property with or without consent of the owner. An "inventory search" refers to such activity as making a list of items found in impounded property, including vehicles, and, in some cases, removing the items to a place of safekeeping. It should not be overlooked that "impoundments" are "seizures" and "inventories" are "searches" within the constitutional proscriptions.

The state does not deny that what occurred here was a search.[1] In *Mozzetti v. Superior Court of Sacramento County,* 4 Cal 3d 699, 94 Cal Rptr 412, 484 P2d 84 (1971), the California Supreme Court described an inventory as follows:

---

[1] At the suppression hearing defendant argued that the exploration into the glove compartment was in reality a search requiring both probable cause and a warrant either because it was overly intrusive or because it was undertaken for investigatory motives. The state's position on this point was not articulated. When the trial judge made his ruling on admission he stated only that "[t]he map and wine bottle were the product of the inventory search." The ruling indicates the judge's view that this inventory was a search but need not be supported by probable cause or a warrant.

"The inventory, by its nature, involves a random search of the articles left in an automobile taken into police custody; the police are looking for nothing in particular and everything in general. But this fact does not justify the search and establish its constitutionality. To the contrary, a random police search is the precise invasion of privacy which the Fourth Amendment was intended to prohibit." 4 Cal 3d at 711.

In *Camara v. Municipal Court,* 387 US 523, 87 S Ct 1727, 18 LEd 2d 930 (1967), the United States Supreme Court rejected any narrowing of the scope of the fourth amendment to "the typical policeman's search for the fruits and instrumentalities of crime," on the theory that "[i]t is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." 387 US at 530.[2] Under Article I, section 9, whatever else a search may be, it certainly occurs when government officials explore areas of private property closed off from public scrutiny. As far as the citizen is concerned, such an examination of property invades his or her privacy and security regardless of the motives upon which the officials act.

The federal Supreme Court has recognized that in the context of non criminal or regulatory searches and seizures the constitutional concepts of probable cause, warrants and reasonableness, may be defined with reference to the administrative function responsible officials are charged with carrying out. *See Camara v. Municipal Court, supra; See v. City of Seattle,* 387 US 541, 87 S Ct 1737, 18 L Ed 2d 943 (1967); *Marshall v. Barlow's, Inc.,* 436 US 307, 98 S Ct 1816, 56 L Ed 2d 305 (1978). In this context, the federal Supreme Court has

---

[2]In *South Dakota v. Opperman,* 428 US 364, 96 S Ct 3092, 49 LEd 2d 1000 (1976), an inventory case factually similar to the present case, a plurality of the court indicated that it was not addressing the question whether inventories were searches, and referenced state court decisions finding that inventories were not searches in light of "the benign noncriminal context of the intrusion * * *." 428 US at 370, note 6. In his concurring opinion, Powell, J. indicates, however, that "routine inventories," presumably those encompassing closed areas of the car as did the inventory in that case, are searches:

"Routine inventories of automobiles intrude upon an area in which the private citizen has a 'reasonable expectation of privacy.' *Katz v. United States,* 389 US 347, 360, 19 L Ed 2d 576, 88 S Ct 507 (1967) (Harlan, J., concurring). Thus, despite their benign purpose, when conducted by government officials they constitute 'searches' for purposes of the Fourth Amendment." 428 US at 377, note 1.

indicated that a statutorily authorized and regularly administered, nondiscretionary inspection procedure may replace the strict requirement for particularized probable cause. In these federal cases, administrative inspectors acted pursuant to legislative authority to enter and search either private residences or business premises. However, in addition, the federal Supreme Court continued to demand compliance with the warrant procedure. The probable cause requirement "will not necessarily depend upon specific knowledge of the condition of the particular dwelling" to be inspected, but the officials must demonstrate compliance with reasonable legislative or administrative standards for inspection, *Camara v. Municipal Court,* 387 US at 538. In *Marshall v. Barlow's, Inc.,* the court explained:

> "A warrant, * * * would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria. Also, a warrant would then and there advise the owner of the scope and objects of the search, beyond which limits the inspector is not expected to proceed. These are important functions for a warrant to perform, functions which underlie the Court's prior decisions that the Warrant Clause applies to inspections for compliance with regulatory statutes." 436 US at 323. (Footnotes omitted.)[3]

I agree with the majority that government search or seizure can only occur pursuant to a source of authority for the action. *See State v. Painter,* 296 Or 422, 676 P2d 309 (1984). I disagree with the majority, however, on the following points.

First, I do not accept the majority's narrow view that the constitutional guarantees against warrantless and factually unsupported searches and seizures apply only, or most particularly, to the enforcement of the criminal laws. Historically, the government abuses which sparked enactment of our federal fourth amendment were carried out against the American colonies by government officials fulfilling what we would probably consider today to be an administrative or regulatory function, that is, customs control and the regulation of commerce.

---

[3]The obvious difficulties in defining administrative functions and criminal law enforcement responsibilities need not be addressed here.

During colonial times, the British government enacted a variety of regulations restricting the colonies from trading with anyone but England or her dependencies. The Molasses Act of 1733, which imposed a prohibitive duty on molasses and sugar imported from the non-British West Indies, was one such restriction. The act was weakly enforced, however, until 1760, when England decided to halt the thriving illegal trade. A potent weapon was found in the writs of assistance, which granted to officers in broadly written terms the power to search any house or shop, to break open doors, chests and packages, and to remove prohibited goods. The effect of these writs was more invidious even than those used in England. In England they had been employed in particular libel cases and were, therefore, inherently limited. In the colonies the writs were not returnable after execution but were good as a continuous license during the lifetime of the sovereign. Lasson, *The History and Development of the Fourth Amendment* (1937 repr 1970).

Reaction against the writs found its full expression in Massachusetts. In 1772 the citizens of Boston composed a document which identified those rights that the colonists regarded as fundamental, among others, freedom from writs of assistance, by which "Officers * * * break thro' the sacred rights of the *Domicil,* ransack men's houses, destroy their securities, carry off their property, and * * * commit the most horred *[sic]* murders." Schwartz, *The Great Rights of Mankind* 61 (1977). Two years later in a petition to the King for redress of grievances, the Continental Congress complained:

> "The officers of the customs are empowered to break open and enter houses, without the authority of any civil magistrate, founded on legal information."

Landynski, *Search and Seizure and the Supreme Court,* 37-38 (1966).

In 1776, even before the Declaration of Independence, Virginia adopted a Constitution and Declaration of Rights, the first true bill of rights in the modern American sense. Many of the rights included in the Declaration extended well beyond those known in Britain at that time. One right was the guaranty of protection against general warrants:

"10. That general warrants, whereby any officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offence [sic] is not particularly described and supported by evidence, are grievous and oppressive and ought not to be granted."

1 Schwartz, *The Bill of Rights, A Documentary History* 235 (1971). Seven of the eleven other colonies which subsequently adopted constitutions included provisions, similar to that of Virginia, barring the use of general warrants. Schwartz, *The Great Rights of Mankind* 88 (1977). From these antecedents emerged the federal fourth amendment. It is clear that the amendment was founded on the notion that all persons should be free from governmental searches and seizures, not only those who are the subject of criminal investigation.

Second, the majority suggests that inventory searches are even less amenable to constitutional regulation than other administrative searches because, unlike searches for evidence of crime or regulatory noncompliance, inventories are not undertaken to discover anything in particular. In the majority's words, an inventory is not a " 'search' for predictable 'things to be seized' that could be 'particularly described,' as the warrant requirement of Article I, section 9 contemplates." 298 Or at 8. Contrary to the conclusion the majority draws, I find that this distinction renders inventory searches even less defensible. It may be that the constitution requires, at a minimum, a discovery objective, that is, that the search take place for the purpose of discovering something, precisely so that "things to be seized" can be "particularly described." If this is the case, then searches undertaken with no particular discovery objective would fail to meet a threshhold constitutional requirement.

What, then, are the objectives which the majority finds might render this search constitutionally "reasonable"? The majority accepts two of the three rationales advanced in *South Dakota v. Opperman,* 428 US 364, 96 S Ct 3092, 49 L Ed 2d 1000 (1976) the need to protect property while in government custody and the need to protect government custodians from claims of lost or stolen property. The majority acknowledges that the degree to which government officials can search property lawfully in their custody will depend "upon the purpose of the custody." 298 Or at 8. However, the majority

also indicates that so long as government officials have been delegated authority to seize and search property, in this case to impound and inventory vehicles, the justifications advanced in *Opperman* "are important considerations whenever full custody of personal property is authorized." 298 Or at 10. This is my third point of disagreement with the majority. The *Opperman* inventory rationales have no automatic application in the administrative search and seizure context. Whether a particular search of private property in a non criminal context is "reasonable" under the constitution must be measured against the purpose of the delegated authority. The justifications for an administrative search necessarily will be defined within the context of the administrative authority, function and purpose by which the search is undertaken. For example, a particular state official may be authorized to take responsibility for lost property. This responsibility may also include an obligation to attempt to return lost property to its owner. Toward this end, the official might be able to search the property to the extent necessary to fulfill this function, that is, for the purpose of discovering the owner's identity and ascertaining a means to contact that person. However, unless the official can point to some further administrative duty or duties that could be fulfilled only by examining each item inside the property, making a list of these items and, in some cases, removing them — that is, by making an inventory — then a further intrusion of this nature would not be allowed.

Inventory searches of automobiles for non investigatory reasons are not new. This type of search and the justifications upon which it is premised have been criticized often. *See* Comment, *Chimel v. California: A Potential Roadblock to Vehicle Searches,* 17 UCLA L Rev 626 (1970). Judge Moylan took issue particularly with the justification that inventories are necessary to protect car owners' property:

> "It is unrealistic to see in the justifications advanced for the inventory search any substantial counterweight to the basic Fourth Amendment protection of privacy. The failure to consult the wishes of the individual concerned makes a mockery of the claim that the search is in the interest of protecting his personal property. It would be of small comfort to go to the penitentiary, reassured that you are there only because the police were adamant in protecting you from petty theft regardless of whether you wished such protection. To

permit an otherwise prohibited intrusion because it is 'routine police policy' is to allow the Fourth Amendment protection to 'approach the evaporation point.'" Moylan, *The Inventory Search of an Automobile: A Willing Suspension of Disbelief,* 5 U Balt L Rev 203, 219-220 (1976). (Footnote omitted.)

Another commentator has questioned the utility of inventories as a protection for the police.

"If the inventory does, in fact, protect the defendant against theft and the police against false charges of theft, its use might be justified. However, it is at least doubtful that inventories serve any purpose other than as a means of a warrantless search for evidence. If the arrestee or a third person subsequently brings a civil action for the alleged loss of property from the vehicle, the burden is on the claimant to prove that the article was left in the automobile and that the bailee failed to return it. The only possible situation in which the inventory would aid the claimant would be if the missing articles appeared on the inventory receipt. However, if the article was stolen either before the inventory or perhaps innocently omitted when the inventory was taken, the inventory would be to the claimant's disadvantage. Furthermore, the inventory would be of only limited benefit to the bailee or the police if the missing articles were not listed on the inventory receipt. First, the inventory is prepared by the police and is to some extent a self-serving document. Second, even if the police have the arrestee acknowledge the inventory by signing the receipt, the inventory would not be binding on a third party claimant. In any of the possible permutations, absent a special statutory provision, the inventory would not be conclusive of the issue." Comment, *The Aftermath of Cooper v. California: Warrantless Automobile Search in Illinois,* 1968 Ill L.F. 401, 407-08 (1968).

One of the most frequently cited cases addressing inventory searches, and one followed by this court in *State v. Keller,* 265 Or 622, 510 P2d 568 (1973), is *Mozzetti v. Superior Court of Sacramento County, supra.* In *Mozzetti,* the driver was unavailable to decide how to safeguard property in the car. Because the car was blocking traffic the police towed it, impounded it and, in accordance with police department policy, inventoried its contents. The court suppressed evidence obtained from a suitcase in the car because it rejected the rationales advanced in support of the reasonableness of

inventory searches. Protecting the owner's property was considered an insufficient reason to violate Fourth Amendment rights. According to the court, sufficient protection could be extended by "rolling up the windows, locking the vehicle doors and returning the keys to the owner. The owner himself, if required to leave his car temporarily, could do no more to protect his property." 4 Cal3d at 707. *Mozzetti* dismissed the need to protect the police from tort claims as "even less convincing." 4 Cal3d at 708.

*Boulet v. State,* 17 Ariz App 64, 495 P2d 504 (1972), also approved in *Keller,* dismissed the rationales upon which inventory searches are based as follows:

> "We would first observe the taking of an inventory does not insure the safety of the contents nor does it ipso facto prevent an owner from later claiming that goods had been stolen or damaged.
>
> "We fail to see how the taking of an inventory will insulate the police against false accusations of theft and assure the property owner that his property will not be taken. Unscrupulous persons who desire to steal articles will simply not list them on the inventory. Owners who wish to assert spurious claims against law enforcement officials or the garage owners can simply claim that the officers did not list them on the inventory. In fact, we can envision instances when the taking of an inventory may actually alert potential thieves to the value of items contained in the automobile. In balancing the conflicting interests we find a countervailing interest in maintaining the privacy of one's personal effect and preventing anyone, including the police, from searching suitcases and other closed containers which may be in the automobile at the time it is being removed to storage. We believe that each of these interests can be adequately safeguarded by measures short of inventory search conducted in this area." 17 Ariz App at 68-69, 494 P2d at 508-09.

Because vehicle searches could not be justified by the rationales advanced, both *Mozzetti* and *Boulet* concluded that the police may not search, but may only inventory items of personal property "clearly visible without probing," *Mozzetti,* 4 Cal3d at 707. *See also Boulet,* 17 Ariz App at 69, 495 P2d at 509.

A number of other states have viewed inventory searches with caution, and have rejected, either in whole or in

part, the rationales offered to support such searches. *State v. Opperman, on remand* 247 NW2d 673 (SD 1976); *State v. Mangold,* 82 NJ 575, 414 A2d 1312 (1980); *State v. Goff,* 272 SE2d 457 (W Va 1980); *Wagner v. Commonwealth,* 581 SW2d 352 (KY 1979); *State v. Gaut,* 357 So2d 513 (La 1978); *State v. ·Sawyer,* 571 P2d 1131 (Mont 1977); *State v. Boster,* 217 Kan 618, 539 P2d 294 (1975); *State v. Bradshaw,* 41 Ohio App 2d 48, 322 NE2d 311 (1974). Like *Mozzetti* and *Boulet,* these cases considered the rationales upon which such searches are based, rejected these as insufficient to uphold a warrantless search, and limited police conduct to activities short of a search, such as listing property that can be seen from outside the car, which furthered the purposes of such inventories. The majority of these decisions are based on interpretations of state constitutional provisions. *See Opperman,* 247 NW2d at 674; *Sawyer,* 571 P2d at 1134; *Gaut,* 357 So2d at 516; *Wagner* 581 SW2d at 356; *Mangold,* 414 A2d at 1315; *Goff,* 272 SE2d at 460.

I would hold the search in this case unlawful under Article I, section 9 of the Oregon Constitution.

Lent, J., joins in this dissent.