Argued and submitted September 30, 1999, affirmed June 28, 2000

## STATE OF OREGON,
### *Appellant,*

*v.*

## VICKIE MARIE TYLER,
### *Respondent.*

## (C 9709-36987; CA A101407)

7 P3d 624

Kaye McDonald Sunderland, Assistant Attorney General, argued the cause for appellant. With her on the

brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Andy Simrin, Deputy Public Defender, argued the cause for respondent. With him on the brief was David E. Groom, Public Defender.

Before Edmonds, Presiding Judge, and Deits, Chief Judge,* and Armstrong, Judge.

ARMSTRONG, J.

---

* Deits, C. J., *vice* Warren, S. J.

## ARMSTRONG, J.

Defendant is charged with possession of cocaine that a Portland police officer discovered during an inventory of her person after he arrested her for crossing a street at other than a right angle, in violation of a city ordinance. The trial court concluded that the city could not authorize an arrest for that offense and therefore suppressed evidence of the cocaine. The city appeals, and we affirm.

■ We state the facts as the trial court found them, resolving any evidentiary disputes that the trial court did not expressly decide in a way that supports its ruling suppressing the evidence. *See Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968). Early in the morning of September 14, 1997, the officer saw defendant walking east down the middle of North Blandena Street, heading toward North Interstate Avenue. The officer stopped defendant and, with defendant's cooperation, determined her identity. The officer then arrested defendant for violating Portland City Code § 16.70.220, which requires a pedestrian who crosses a street other than at a crosswalk to do so at right angles to the street. In making the arrest, the officer exercised his discretion not to issue a citation.[1] He knew, however, that he would release her after conducting an inventory,[2] because the jail would not accept persons arrested for that offense. After the arrest, the officer conducted the inventory, during the course of which he found the cocaine in issue.

■ The decisive issue is whether the city may punish a violation of Portland City Code § 16.70.220 as a crime. If it may not, the officer did not have the authority to arrest defendant on that charge. *See* ORS 133.235(1); ORS 161.515. The city established the penalties for violating this and other ordinances in Portland City Code § 14.08.020:

---

[1] According to defendant, the officer did not arrest her until after she refused to consent to a search.

[2] The parties refer to the officer's actions as an "inventory search," a phrase that we generally avoid because it is internally contradictory. An inventory, whose purpose is simply to itemize what is present, is different in substance from a search, which is an endeavor to find evidence. The legal foundation and the rules for conducting an inventory are entirely different from those for a search. *See State v. Atkinson*, 298 Or 1, 688 P2d 832 (1984).

"Violation of any provision of this Code is punishable, upon conviction, by a fine of not more than $500, or by imprisonment not exceeding 6 months, or both. However, no greater penalty shall be imposed than the penalty prescribed by Oregon statute for the same act or omission."

Thus, a violation of a Portland ordinance is a crime unless the state imposes a noncriminal sanction for the same conduct. That exception reflects the Supreme Court's cases under Article XI, section 2, of the Oregon Constitution. For the reasons that we discuss below, we conclude that those cases have a broader reach than the ordinance suggests. The state's policy decision to decriminalize all minor traffic infractions, including pedestrian violations, forecloses the city's decision to impose criminal penalties for comparable, even if not identical, offenses.

█ We first discuss the cases concerning legislative preemption of city criminal penalties; we then consider how they apply to this case. The foundation for the analysis is Article XI, section 2, which provides, in pertinent part:

"The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon * * *."

Although the Supreme Court has given that provision a variety of constructions since its adoption in 1906, the court's general approach has been consistent since 1978, when it decided *LaGrande/Astoria v. PERB*, 281 Or 137, 576 P2d 1204, *on recons* 284 Or 173, 586 P2d 765 (1978). Under that case, the city has broad authority to act on a wide variety of matters, but the legislature may usually preempt that authority, implicitly or explicitly, for a specific subject, either civil or criminal. The cases most relevant to this one involved the application of *LaGrande/Astoria* to Portland ordinances that carried criminal penalties.

█ In *City of Portland v. Dollarhide*, 300 Or 490, 714 P2d 220 (1986), the city adopted an ordinance that prohibited prostitution in essentially the same terms as the comparable state statute. However, the city ordinance provided for a minimum penalty on conviction, while the state statute did not. In determining whether the minimum penalty was within

the city's authority, the court held that, under *LaGrande/ Astoria,* the test for whether a state law preempts a local civil or criminal ordinance is whether the local rule is incompatible with the legislative policy, either because the two cannot operate concurrently or because the legislature intended the state law to be exclusive. For civil ordinances, the assumption is that the legislature did not intend to displace the local ordinance; on the other hand, because of the constitutional provision the assumption is that the legislature *did* intend to displace a criminal ordinance. 300 Or at 501.

■ ■ The question, in either case, is one of legislative intent. When a statute permits actions that an ordinance prohibits, or prohibits actions that an ordinance permits, the legislature has preempted the ordinance. In the same way, a city may not impose a greater punishment than a statute imposes for acts that both the statute and an ordinance prohibit; it may, however, impose lesser punishments. 300 Or at 502. In *Dollarhide* the court affirmed the defendant's conviction under the ordinance but invalidated the minimum penalty, because it was a greater punishment than the state imposed.

In two later cases the court considered the ways in which the legislature may show its intent to preempt local criminal ordinances. In *City of Portland v. Lodi,* 308 Or 468, 782 P2d 415 (1989), the ordinance prohibited carrying a concealed pocketknife with a blade longer than three and a half inches. At the time of the adoption of the ordinance, a state statute prohibited carrying a number of dangerous weapons but excluded an "ordinary pocketknife." The city apparently combined that provision with another statute to arrive at its prohibition of pocketknives longer than the designated length. Thereafter, however, the legislature amended the state statutes to remove any reference to concealed knives other than switchblade knives. The question in *Lodi* was whether the legislature had thereby permitted possession of those things that it did not expressly prohibit, including the knife in question. 308 Or at 472-73. The court noted that legislative permission may range from express permission to total inattention and indifference. "The search is not for particular words but for a political decision, for what the state's lawmakers either did or considered and chose not to do." *Id.* at 474. In *Lodi,* the legislative history showed that the legislature, in amending the relevant statutes, had consciously

decided to exclude any reference to a concealed knife unless there was an intent to use it unlawfully against a person. That action displaced the city's ordinance. *Id.* at 475.

In *City of Portland v. Jackson*, 316 Or 143, 850 P2d 1093 (1993), the city had adopted an ordinance prohibiting public nudity that tracked the state statute except that, while the statute applied only if the person acted with the purpose of arousing the sexual desire of the person or another, the ordinance prohibited nudity without regard to the person's purpose. The court held that the statute did not preempt the ordinance. It noted that it had consistently held that "the validity of local criminal legislation turns on whether it conflicts with state legislation." In resolving that issue, it had to determine whether the statute *permits* the conduct that the ordinance prohibits. If so, the statute will displace the ordinance. The statute could permit the conduct by an express legislative decision, a decision apparent in the legislative history, or otherwise. 316 Or at 151. The court then examined the legislative history of the statute and concluded that, although the legislature had determined that nonsexually motivated public nudity would no longer be a state crime, it did not intend to permit it. *Id.* at 153-54. The statute did not, therefore, preempt the ordinance.

In this case we are not concerned with different penalties for the same conduct, as in *Dollarhide*, or with the same penalty for somewhat different conduct, as in *Lodi* and *Jackson*.[3] Rather, the question is whether the city may make a crime of conduct that is of the same kind but not identical to conduct that the state treats as a noncriminal violation. Twenty-five years ago the legislature established a clear state policy that minor traffic infractions, including those jaywalking offenses that are the subject of state law, should be treated as violations, not as crimes. We hold that, because of that state policy decision, the city may not make a violation of this jaywalking ordinance a crime punishable by imprisonment.

■ When the legislature rewrote the Oregon Vehicle Code (the Code) in 1975, it made a conscious decision to

---

[3] The same penalty for different conduct was also the focus of our opinion in *City of Portland v. Marshall*, 82 Or App 497, 728 P2d 903 (1986), *rev den* 302 Or 657 (1987).

decriminalize all except the most serious traffic offenses, a decision that it has continued through further revisions to the Code since 1975. *See* Or Laws 1975, ch 451. That decision is clear both from the provisions of the Code themselves and the comments of its drafters. The Code[4] establishes four categories of noncriminal traffic infractions, *see* ORS 801.557; ORS 153.018, which provide the penalties for almost all traffic offenses. Only a few traffic offenses, such as reckless driving or driving under the influence of intoxicants, are crimes. *See* ORS 811.140; ORS 813.010.[5] All of the provisions concerning pedestrians that we describe below are Class D traffic infractions, the lowest level of penalty that the Code provides.

In their report to the legislature, the drafters of the Vehicle Code made clear their intention to decriminalize minor traffic infractions. In their introduction to the Code, they identified a number of defects in the previous treatment of traffic offenses as crimes and proposed, instead, to create "a new, noncriminal offense designated as a 'traffic infraction' " and to place all but the most serious traffic offenses into that category. The primary purpose for that decision appears to have been the court congestion that resulted from giving a motorist charged with a minor offense the "full panoply of procedural Due Process protections guaranteed to criminal defendants by the Constitution."

The Code included pedestrian infractions in the minor traffic offenses that it decriminalized. However, although that Code imposes a number of requirements on pedestrians, it does not prohibit crossing a street at other than right angles, the conduct that the ordinance makes a crime. ORS 814.010 describes the rules for pedestrian responses to traffic control devices;[6] ORS 814.030 requires pedestrians to obey bridge and railroad signals; ORS 814.040 describes when a pedestrian must yield to a vehicle; ORS

---

[1] We cite the current version of the Code, which has been amended and renumbered since its adoption without affecting the points that we make in this opinion.

[5] The 1975 revision to the Code unsuccessfully attempted also to decriminalize the first offense of driving under the influence of intoxicants. *See Brown v. Multnomah County Dist. Ct.*, 280 Or 95, 570 P2d 52 (1977).

[6] ORS 814.020 establishes the penalty for a failure to comply with the rules that ORS 814.010 creates.

814.050 requires a pedestrian to yield to an emergency vehicle; ORS 814.060 requires the use of a pedestrian tunnel or overhead crossing when one is available; and ORS 814.070 describes various prohibited methods of walking along a highway. Each offense is a Class D traffic infraction, punishable by a fine of no more than $75, is not designated as a crime, and carries no possibility of imprisonment. ORS 801.557; ORS 153.018(1), (2). In addition to expressly prohibiting some conduct, the legislature permitted road authorities, which include cities as to all roads and streets within their boundaries, other than state highways, ORS 810.010(3), to impose additional rules relating to the use of crosswalks. ORS 810.080.

None of these statutes relates to the conduct for which the officer arrested defendant, crossing a street at a place other than a crosswalk, other than at right angles. For the purposes of this opinion, we assume that the legislature did not preempt the city's authority to enact Portland City Code § 16.70.220 and thus to regulate defendant's conduct in ways in addition to those that these statutes describe. That ordinance, however, regulates conduct that, while different in specifics, is in its essence of the same nature and character as the conduct that the state regulates and to which it has attached a minor noncriminal penalty. We therefore conclude that the legislature has preempted the city's authority to establish a criminal penalty for the violation of the ordinance.

This case involves a variation on *Dollarhide*, because, unlike in *Dollarhide*, the state's preemption of the city's sanction for violating the ordinance comes from a general state policy that applies to all statutes of this type rather than from a specific conflict between the statute and the ordinance. In *Dollarhide*, the court recognized that a related problem could arise if the state decriminalized certain conduct, referring to the previous repeals of the crimes of adultery, of lewd cohabitation and of the possession of small amounts of marijuana. It pointed out that the assumption that the legislature intended to displace conflicting local criminal ordinances, in the absence of intent to the contrary, does not apply when there is no applicable state criminal law.

Thus, a "court would have to ascertain whether the legislature, by repealing a statute or decriminalizing certain conduct, intended also to preclude local prohibition and punishment of that conduct." *Dollarhide*, 300 Or at 502 n 9.

 We are not concerned with whether a city may prohibit and punish certain conduct but with whether it may make that conduct criminal and punish it by a relatively large fine and imprisonment. However, the considerations that the court described in *Dollarhide* apply. As the later cases point out, we must decide whether the legislature intended the state sanctions to be exclusive or whether it is possible for the state and local provisions to operate concurrently. In making the first decision, we look not for any particular form of words but for a political decision—what the state's lawmakers did or decided not to do. In making the second decision, we look at whether the local ordinance would operate inconsistently with the state statute.

Here the answer is obvious. The legislature made a political decision in 1975 to decriminalize minor offenses such as that involved in this case, and it has maintained that decision through all subsequent changes in the Code.[7] As a result, if the city decides to prohibit the same conduct that the legislature has prohibited, it cannot impose criminal penalties for that conduct. For the city to be able, nevertheless, to make a crime of conduct that is similar in nature, although different in specifics, to that described in the Code would run in the face of the legislature's decision. It would also mean that the city's criminal ordinances would operate inconsistently, both with the state Code and with its own ordinances that are copies of the Code. For example, a pedestrian who crossed in a crosswalk against a "Don't Walk" signal, or who walked down the middle of a street with no intention of crossing it, both of which the state statutes prohibit, would be subject to a fine of no more than $75, while a pedestrian who crossed a street diagonally outside of a crosswalk would be

---

[7] The city argues that the reason for that decision was a desire to relieve the pressure on the overburdened state court system and suggests that that desire does not show any intention to restrict a city's authority. To the extent that that argument may have any force, it does not apply to Portland, because the state courts enforce all of the city's local traffic offenses.

subject to a fine of $500 and six months in jail. The legislature has preempted the city's authority to do that. As a result, defendant's actions did not constitute a crime, and the officer did not have the authority to arrest her. The trial court correctly suppressed the evidence that the officer found during an inventory after that arrest.

Affirmed.