Argued and submitted September 28, reversed and remanded for new trial
December 19, 1984

# STATE OF OREGON,
*Respondent,*

*v.*

# KENNETH FRANCIS RIDDERBUSH,
*Appellant.*

(CC83-812; CA A32302)

692 P2d 667

Blair J. Henningsgaard, Astoria, argued the cause for appellant. With him on the brief was Brownhill & Henningsgaard, Astoria.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were

Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

This is a criminal case in which we are called on to determine whether the trial court's denial of defendant's motion to suppress a straight razor discovered in a small black box was error under Article I, section 9, of the Oregon Constitution as either: (1) an improper search incident to arrest; or (2) an improper inventory search. We reverse and remand.

It was error for the trial court to deny defendant's motion to suppress, because the search at the police station which revealed the razor was improper both as a search incident to arrest under *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982), and as an "inventory" under *State v. Atkinson,* 298 Or 1, 688 P2d 832 (1984).

This case began when Officer Logsdon of the Astoria Police Department received a call at approximately 10:20 a.m. on August 27, 1983, that an individual was threatening people with a club in downtown Astoria. Logsdon arrived at the location and saw defendant engaged in an argument with, and shaking a club at, a person across the street from him. Logsdon took defendant into custody for menacing. During an on-the-scene "pat-down," he found several items in defendant's pockets, including a small black box. The box had several rubber bands wrapped around it securing pens and pencils. Logsdon asked defendant the contents of the box and was told that it contained "pencils." Although Logsdon did not believe the answer, he returned the box to defendant's pocket without examining its contents. Defendant was then handcuffed and taken to the Clatsop County Jail.

On arrival at the jail, defendant was searched again by Officer Tagg of the Clatsop County Sheriff's Department. Department policy required Tagg, as part of the booking process, to make an inventory of items found in defendant's possession. Defendant placed the items in his possession, including the small black box, on a counter. Although Tagg did not suspect that the box contained anything other than "pencils,"[1] he opened it and discovered a straight razor. At

---

[1] Logsdon had not communicated to Tagg his suspicion that the box might contain something other than pencils.

that point, defendant was arrested for carrying a concealed weapon, in addition to the menacing charge.

At a pretrial hearing, defendant moved to suppress the straight razor. The trial court denied the motion, and defendant was subsequently convicted only on the charge of carrying a concealed weapon.

We first address defendant's claim that the opening of the box was an invalid search incident to arrest under Article I, section 9. The state contends that the search was valid under *State v. Caraher*, 293 Or 741, 653 P2d 942 (1982). In *Caraher*, the Oregon Supreme Court interpreted Article I, section 9, to permit a warrantless search of the person incident to a valid custodial arrest, if the search was necessary either (1) to protect the arresting officer, or (2) to prevent the destruction of evidence or (3) was relevant to the crime for which the person was arrested. *State v. Caraher, supra,* 293 Or at 759. In addition, any search must be reasonable "as to time, space and intensity," taking into consideration the relevant facts. *State v. Caraher, supra,* 293 Or at 758.

Defendant was properly arrested at the scene for menacing and taken into custody. About removing the black box from defendant's inside coat pocket, Logsdon testified:

"Q. Okay. Had you any suspicions of what might have been in that box?

"A. Yes, sir. I did.

"Q. What suspicions did you have?

"A. Well, the suspicions that I had is, one, the weight of the box was heavier than what I think pencils would weigh. We had had reports in the past that Mr. Ridderbush had been carrying a straight razor or blade of some type the previous week. I believe this arrest was on a Saturday; the previous Sunday we had taken reports from subjects saying that they had been threatened by one.

"Q. By Mr. Ridderbush?

"A. By Mr. Ridderbush.

"Q. With a razor?

"A. With a razor."

On cross-examination, Logsdon further testified:

"Q. Did you have any reason to believe—at that time

[when the box was removed from defendant's pocket], did you have any reason to believe that he was carrying a weapon of any sort?

"A. Just from the reports that he had before or previously regarding threatening people with a razor.

"Q. Okay. You'd taken those reports?

"A. Yes, I did.

"Q. When were they received?

"A. I took a report—our case number 1270 would have been the previous Sunday, I believe.

"Q. Is that approximately a week before?

"A. Yes, sir.

"* * * * *

"Q. Okay. And when you removed the box from Mr. Ridderbush's pocket you asked him what it contained?

"A. Yes, sir.

"Q. And he told you what?

"A. 'Pencils.'

"Q. And you didn't believe him?

"A. No, sir."

On direct examination, Tagg, who had conducted the inventory at the police station, testified:

"Q. Did you then open the box to examine the contents of the inside?

"A. As far as I recall, I did open the box, because it is our policy that I would have been the one to open the box, and when I did open it I do remember Officer Logsdon, he said, 'I suspected something like that.'

"Q. Okay. What did you find when you opened the box, deputy?

"A. It contained a straight razor."

It is obvious from the preceding discussion that Logsdon believed that defendant was carrying a weapon. Yet, despite arresting him for a crime involving threatened violence, Logsdon returned the box containing the razor to defendant's possession. Had Logsdon instead opened the box on removing it from defendant's pocket, the search would have been proper under *Caraher* as a measure to protect his

safety in light of the information he had personally received about defendant less than a week before and his suspicion that the box contained a weapon, a razor. *State v. Caraher, supra.*

■■ Inexplicably, however, Logsdon returned the box to defendant's pocket and, by so doing, he created a logical break in the arrest, and any justification under *Caraher* evaporated. We said in *State v. Flores,* 68 Or App 617, 634, 685 P2d 999, *rev den* 298 Or 151 (1984), that "when a search reaches a logical stopping point the police must seek a warrant before proceeding further."[2] We limited the warrant requirement, however, by cautioning that it should not be imposed in an unrealistic and unnecessary fashion "requiring officers to stop midway in a search, * * * leave everyone in limbo, and seek a warrant [which] would tend to benefit only the stationers who sell blank search warrant forms." *State v. Flores, supra,* 68 Or App at 634. Thus, although the warrant requirement serves as an important limitation on a police officer's right to continue a search, *State v. Kirsch,* 69 Or App 418, 422 n 3, 686 P2d 446 (1984) it only applies when a point has been reached in the arrest process where a reasonable opportunity to secure a warrant has arisen. Such an opportunity existed here, and a warrant should have been sought.

■ When the box was returned to defendant's possession, he was handcuffed, placed in custody and taken to jail. At that point, for all practical purposes, a proper search incident to arrest had been concluded. There was no "continuing encounter," as in *Kirsch,* nor was the opportunity to obtain a warrant impractical or unrealistic. Accordingly, a "logical stopping point" was reached and seeking a warrant at this point would not "leave everyone in limbo." *State v. Flores, supra,* 68 Or App at 634; *see also State v. Kirsch, supra.*

■ Because the search occurred at the police station

---

[2] *See also State v. Kirsch,* 69 Or App 418, 424, 686 P2d 446 (1984), where we said that the warrant requirement does not apply if the "entire episode was one continuing encounter." In the present case, unlike *Kirsch,* defendant was immediately taken to jail and booked, after Logsdon returned the box.

The state argues in its brief that it was reasonable for Logsdon to "handcuff defendant (behind his back, making access to the box in the front pocket impossible), immediately transport him to the jail, and then finish the search in the safer and more practical setting of the jail." That is not what Logsdon did. He arrested defendant, secured him and took him to jail. Tagg's subsequent actions were not conducted on Logsdon's behalf.

pursuant to routine procedures, the justifications for a warrantless search did not exist. Although semantically the search was "incident" to defendant's arrest, the criteria enunciated in *Caraher* were inapplicable. Neither was there any other "practical necessity" to search the contents of the box without a warrant. *State v. Flores, supra,* 68 Or App at 635. Because defendant and his possessions were separated and in custody, the officers had ample opportunity to consult a magistrate and secure a warrant, if they could show probable cause. We therefore conclude that the opening of the box was not valid as a search incident to arrest.

 The state argues, in the alternative, that the search of the box at the police station was a lawful inventory. We disagree. The Oregon Supreme Court recently addressed inventories in *State v. Atkinson,* 298 Or 1, 688 P2d 832 (1984). Although *Atkinson* involved an automobile, the court's language was not exclusively limited in its discussion to automobiles. The court stated:

> "It is not our function to decide as a matter of policy how, and for what purpose, automobiles *or other private property* that come into official custody should be examined. That is a matter for politically accountable officials to decide by laws, ordinances, or delegations of rulemaking authority. Our role * * * is to assure that such policies and procedures as are adopted do not violate constitutional guarantees." *State v. Atkinson, supra,* 298 Or at 6. (Emphasis supplied.)

The court went on to point out the following principal purposes for requiring an inventory of impounded personal property: (1) the protection of the person's property while in police custody; (2) the reduction or elimination of false claims against the police for lost or stolen property; and (3) the protection against possible injury to persons or property from impounded but uninventoried property, *e.g.,* explosives. 298 Or at 7-8. The court then said that, if in the furtherance of those purposes, policy makers prescribe inventorying procedures, the policy will be deemed unreasonable under Article I, section 9, of the Oregon Constitution if: (1) the vehicle or other property is unlawfully impounded or (2), if it is lawfully impounded but the inventory is not "conducted pursuant to a properly authorized administrative program, designed and systematically administered so that the inventory involves *no exercise of discretion by the law enforcement person directing or*

*taking the inventory." State v. Atkinson, supra,* 298 Or at 10.
(Emphasis supplied.) In a footnote, the court cited the
rationale for the latter condition as a guard against
"arbitrariness" (*citing* 2 LaFave, *Search and Seizure* 576
(1978)) and an "assurance that [the property] was not singled
out for special searching attention." (*Citing United States v.
Hellman,* 556 F2d 442, 444 (9th Cir 1977)). 298 Or at 10 n 5.

Obviously, a policy of deferring to administrative
regulations could have undesirable consequences, if the defer-
ence were carried too far: constitutional protections would be
at the mercy of the most intrusively imaginative police chief or
jail administrator. The Supreme Court has foreseen this
problem, however, and has indicated at least one place where
the constitutional line is to be drawn: at inventorying "closed
containers." The court said, in *Atkinson,*

> "The degree to which an inventorying officer may scru-
> tinize the items uncovered is limited. *See State v. Perry,* 298
> Or 21, 688 P2d 827 (1984), decided this date. *See also, State v.
> Keller,* [265 Or 622, 510 P2d 568 (1973)], where we held that
> police conducting an inventory of an automobile 'pursuant to
> administrative requirements' (265 Or at 624) could not open a
> fishing tackle box which was secured with wire tied around it,
> but would be required to inventory only the container as 'one
> fishing tackle box.' 265 Or at 626, 629 * * *." 298 Or at 10.

The 1973 case mentioned by the court, *State v. Keller,
supra,* was not specifically decided under the Oregon Constitu-
tion. The court's reference to it in *Atkinson,* however, now
specifically adopts the *Keller* approach to inventories as the
Oregon constitutional standard. That is made crystal clear by
the court's cross-reference to *State v. Perry,* cited in the quote
above, which was decided the same day as *Atkinson. Perry*
differed from *Atkinson* in that the property inventoried was
taken from a man placed on a "detox hold"—a noncriminal,
nonemergency situation. 298 Or at 21. Again, however, the
court began its analysis with a review of the holding in *State v.
Keller, supra,* and concluded:

> "*State v. Keller, supra,* has been cited with approval. *See
> State v. Atkinson,* 298 Or 1, 688 P2d 832 (1984), where we
> hold that a properly administered noninvestigative auto-
> mobile inventory is permissible under Article I, section 9 of
> the Oregon Constitution and the Fourth Amendment. *See*

*also State v. Downes,* 285 Or 369, 591 P2d 1352 (1979)." *State v. Perry, supra,* 298 Or at 26.

■■ The Oregon constitutional limitation on inventories by the police of property which has come into their possession lawfully, but not incident to an arrest or pursuant to a warrant, is simply this: property is to be listed by its outward appearance; no closed, opaque container may be opened to determine what, if anything, is inside it so that the contents may be inventoried in turn. This is a commendably clear and simple rule, easy to enforce in most circumstances, including those in the present case. Here, Tagg found the evidence in question by opening a closed, opaque container. An inventory of items taken from a prisoner, other than as an incident of his arrest, may not extend so far. *State v. Atkinson, supra; State v. Keller, supra; see State v. Perry, supra.* The trial court should have suppressed the razor.

Reversed and remanded for a new trial.[3]

---

[3] Defendant's other assignments do not require discussion.