Argued and submitted February 18, in Case Number A150288, Counts 1, 13, 14, and 15 reversed and remanded; otherwise affirmed; in Case Number A150289, Counts 2, 3, 4, 6, 7, 8, 9, and 10 reversed and remanded; otherwise affirmed November 5, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JASON PAUL HITE,
*Defendant-Appellant.*

Lane County Circuit Court
201110047, 211111664;
A150288 (Control), A150289

338 P3d 803

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services. Jason Paul Hite filed a supplemental brief *pro se.*

Andrew M. Lavin, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

## HADLOCK, J.

Defendant seeks reversal of a number of convictions related to identity theft and forgery. Before trial, defendant moved to suppress evidence found in his backpack after he was arrested on an outstanding warrant, arguing that the police unlawfully searched the backpack. The trial court ruled that the police were required to inventory the contents of the backpack before taking defendant to jail, and it denied the motion to suppress. On appeal, defendant argues, among other things, that the search was unlawful because it was not conducted pursuant to a facially valid inventory policy that sufficiently limited the scope of the inventory. The state contends that the inventory policy is sufficiently limited and, alternatively, that the search was a constitutionally permissible search incident to defendant's arrest. We agree with defendant that the inventory policy is unconstitutionally overbroad. We reject the state's alternative argument because the state did not raise it in the trial court and, if it had, defendant might have been able to create a different record on the issue. Accordingly, we reverse as to the challenged convictions.

The material facts are undisputed. In January 2011, defendant was on probation for an offense unrelated to this case. As a condition of his probation, defendant was subject to being visited at home by his probation officer, Kenneth Border. During one such visit, Border discovered what appeared to be evidence of identity theft and forgery in a room that defendant had set up as a tattoo parlor. Border contacted the Eugene Police Department and informed Detective Patrick Willis of what he had found. Willis went to defendant's home and conducted a more thorough search. Among other things, he found a wallet containing a number of driver's licenses and other forms of identification that did not belong to defendant or anyone else living in the house; equipment and supplies that could be used for forging checks and identification cards, including a high-quality color printer; discarded paper with printing that appeared to reflect attempts to create a driver's license with defendant's picture and address but the name Gary Keith Walker; several checks purporting to be from Oak Leaf Property Management that were made out to

different people, including "G. Keith Walker"; a check written by someone named Clyde Green to American Mattress Company in 2004, which had been processed by Green's bank; and a computer protected by a password that consisted in part of defendant's nickname, "Fix." Defendant told Willis that other people used the tattoo parlor for various activities. He acknowledged that crimes were being planned there, but he denied being involved. He also denied knowing about the discarded fake driver's licenses, saying that other people must have used his picture to make them in hopes of recruiting him to their criminal operation.

Willis seized the evidence. Further investigation showed that the checks purporting to be from Oak Leaf Property Management were not genuine. A forensic examination of defendant's computer revealed that it had check-writing software that appeared to have been used to create those checks. That software allows the user to enter information for checking accounts—including the payor's name and address, the bank's name, and the account number—from which checks can be written using the software. Information for nine checking accounts had been entered, including one for Oak Leaf Property Management and one for Clyde Green. The software also allows the user to enter and save information for payees—people to whom checks can then be written without having to reenter their information each time. The list of payees on defendant's computer included defendant and G. Keith Walker, both with defendant's address. The software also listed all of the checks that had been created and printed for each of the checking accounts. The list for one account showed that six checks had been made with defendant as the payee. The list for the Oak Leaf Property Management account showed that four checks had been written to G. Keith Walker.

The software also appeared to have been used to create a check that had not previously been connected to defendant. That check purported to be drawn on the bank account of the Beauty Star Salon and was made out to a person whose last name was Bacon in the amount of $3,250. Bacon had been a customer at the salon. She attempted to cash the check at the salon's bank in July 2010, but the bank called the salon's owner, who denied having written the

check. The check-writing software on defendant's computer had a payor account under the name "Beauty Star Salon"; the bank name and address and the checking account number all matched the information on the check that Bacon had attempted to cash. Bacon's name was also on the payee list, along with an address that matched the one given for Bacon on the check.

Based on the seized evidence, defendant was later indicted for 13 counts of identity theft, ORS 165.800, one count of criminal possession of a forgery device, ORS 165.032, and one count of first-degree criminal possession of a forged instrument, ORS 165.022.[1] One of the identity theft counts was based on the discarded evidence of the attempts to create a forged driver's license in Walker's name. Another identity-theft count was based on the forged check purporting to be from the Beauty Star Salon. The remaining identity theft counts were based on other identification documents that turned out to have been stolen. The count for criminal possession of a forgery device was based on defendant's computer, the printer, and other equipment and supplies seized from his tattoo parlor. The count for criminal possession of a forged instrument was based on the four checks purporting to be from Oak Leaf Property Management.[2] A warrant for defendant's arrest was issued.

In May 2011, Eugene police officer Ryan Molony parked his patrol car near defendant's home. Detective Willis had requested that officers attempt to locate defendant and notify him if they did. While he was parked there, Molony saw a man and a woman walking nearby. The woman shoved the man, and the couple engaged in "a little bit of a scuffle." Molony called for backup, got out of his car, and approached the couple. As he did, he recognized the man as defendant. Defendant was carrying a backpack, and the woman, who turned out to be defendant's wife, Melissa Hite, was carrying a purse. Molony separated them and told them to put

---

[1] In addition to the evidence of identity theft and forgery, Willis seized brass knuckles and a set of shaved keys. Defendant was convicted of felon in possession of a restricted weapon and possession of a burglary tool or theft device based on those items. He does not challenge those convictions on appeal.

[2] No charges were filed based on the evidence related to Clyde Green, who had died in 2010.

their bags down and to sit on the sidewalk. They both put their bags down but, instead of sitting, both squatted down. Molony again told them to sit. Defendant jumped up and ran away, leaving his backpack behind, but he tripped over the curb on the other side of the street, and Molony caught him there and took him into custody. While Molony was dealing with defendant and waiting for backup officers to come, Hite picked up defendant's backpack and left. When another officer, Malcolm McAlpine, arrived, Molony described Hite and told him to look for her.

Hite dropped the backpack in a nearby yard and then hid in another house. A resident of that house found her and told McAlpine, who was canvassing the area. McAlpine notified Molony, who went to the house. According to Molony, Hite was arrested for "tampering with physical evidence and interfering." In the meantime, a resident of the house where Hite had dropped the backpack found it and told another officer who had arrived to assist. That officer told McAlpine, who retrieved the backpack and took it to Molony. Defendant said that the backpack was his.

Molony then talked to Hite, who had been placed in the back of another officer's patrol car. He asked her why she had taken the backpack. She answered that "she thought there were illegal things in the backpack and that's why she took it and tried to hide it."

Molony concluded that the backpack was defendant's and that he was "going to take it with him to jail because [defendant] was under arrest and he was going to jail so the backpack had to be inventoried." Molony testified at the suppression hearing that, following the Eugene Police Department's inventory policy, he "opened the backpack to inventory it for dangerous weapons, explosives, hazardous materials, things of that nature. Perishable items that can't be stored in the lockers at the jail." According to Molony, because of the backpack's size, "it would have been stored in the outside metal lockers in the jail inside the secure storage."

When Molony opened the main pouch of the backpack, he saw photo identification cards for different people and other documents that he suspected were evidence of

identity theft. Because he knew that Detective Willis was seeking defendant in connection with identity theft, he contacted Willis and told him that he might be interested in the backpack's contents. Molony then finished checking the backpack for dangerous items.

When Willis arrived at the scene, he also looked through the backpack in order to "ma[k]e sure there was nothing dangerous in it" before putting it in his car. He looked in every compartment of the backpack and opened and thumbed through notebooks that were in it. Like Molony, he saw identification cards that did not belong to defendant. Willis took the backpack to the police station, where he emptied it and documented everything that was in it. There were a number of items with Gary Walker's name on them, including a checkbook, a debit card, a letter from Wells Fargo Bank rejecting an application to open a bank account, a promissory note for a student loan that had Walker's driver's license number on it, and a forged driver's license with defendant's picture and address but Walker's name and license number. Willis also found another check written by Clyde Green that had been processed by Green's bank. The backpack also contained a number of other documents that belonged to other people, including driver's licenses, debit and credit cards, social security cards, checkbooks, bank statements, tax documents, and money orders.

In August 2011, a grand jury indicted defendant on nine counts of identity theft based on the evidence discovered in his backpack.[3] The resulting case (number 211111664) was tried together with the case resulting from the January 2011 indictment (number 201110047).

Before trial, defendant moved to suppress the evidence found in his backpack. In a memorandum in support of the motion, defendant asserted, among other things, that, as a general rule, the police may not open closed containers as part of an inventory, with the exception of containers that are uniquely designed to carry valuables, such as wallets and fanny packs. The state cited the inventory policies of

---

[3] The grand jury also charged defendant with one count of interfering with a peace officer. Defendant was convicted of that charge and does not challenge the conviction on appeal.

both the Eugene Police Department (EPD) and, because defendant was lodged at the Lane County Adult Correctional Facility (LCACF), the Lane County Sheriff's Office (LCSO), which operates that jail. Under those policies, large items such as defendant's backpack must be stored in the outdoor storage lockers at the LCACF. Neither policy explicitly addresses the inventory of closed containers, such as defendant's backpack, but both policies require the arresting officer to inventory any property stored in the lockers to ensure that it does not contain items such as firearms, explosives, or other hazardous materials.[4] EPD's policy also requires officers to inventory prisoner property before transporting it in a police vehicle. The state argued that defendant's backpack "was able to hold anything that—certainly many things that could have been against both EPD's inventory policy about carrying them in a secure car and the jail's policy about allowing those things into the storage lockers at the jail." The trial court denied defendant's motion, stating that "there's a policy to search the defendant and his property before it makes it to the jail gate and [the police did] that pursuant to policy."

At trial, the state presented the evidence found in defendant's backpack in support of the identity theft charges in Case Number 211111664. It also relied on that evidence to refute defendant's defense in Case Number 201110047. In that case, defendant argued that, although the evidence found in his home in January 2011 showed that identity theft and forgery were being committed there, there were reasonable doubts about whether he was involved in those crimes. The state argued that the evidence found in defendant's backpack undermined his assertion that the crimes committed in his home could have been the work of other people.

In Case Number 201110047, the jury convicted defendant of possession of a forgery device, possession of a forged instrument, possession of a burglary tool or theft device, and two counts of identity theft—the count based on the discarded attempts to create a driver's license with

---

[4] We quote and discuss the pertinent provisions of the inventory policies below.

defendant's picture and address but Gary Walker's name, and the count based on the forged Beauty Star Salon check. The jury could not reach a verdict on the remaining identity-theft counts that were submitted to it.[5] In Case Number 211111664, the jury found defendant guilty of interfering with a peace officer and eight counts of identity theft.[6] Defendant appeals, challenging the identity-theft and forgery-related convictions.

Defendant assigns error to the denial of his motion to suppress the evidence found in his backpack. As he did in the trial court, he raises a number of grounds on which he asserts that the evidence should have been suppressed. Because it is dispositive, we address only his argument concerning the validity of the inventory policies. Defendant asserts that Molony and Willis conducted their inventories under EPD General Order 601.4, which requires police officers to inventory prisoner property and to look for firearms, explosives, and other hazardous materials. Defendant contends that the order violates Article I, section 9, of the Oregon Constitution because it does not confine officer discretion to opening closed containers that are uniquely designed or objectively likely to contain such items.

The state responds that, because Molony intended to take defendant to the LCACF, the inventory was governed by the LCSO policy rather than the EPD policy. Moreover, the state observes, EPD General Order 502.1(I)(A)(1) requires Eugene police officers to "comply with all jail rules," including the LCSO inventory policy. The state acknowledges that the LCSO policy has no provisions expressly addressing inventories of closed containers. However, according to the state, the part of the policy that applies to the use of the outdoor storage lockers implicitly requires officers to open certain closed containers. Specifically, the state notes that LCSO Order 02.02.05(D)(5) provides that the arresting

---

[5] At trial, four of the alleged victims in Case Number 201110047 did not testify, and the state withdrew the four identity-theft counts related to those individuals. Defendant pleaded guilty to felon in possession of a restricted weapon before trial, so that charge was also not submitted to the jury. Defendant does not challenge that conviction on appeal.

[6] The state also withdrew one of the identity-theft counts in Case Number 211111664.

officer "is responsible for inventorying the [prisoner's] property and insuring that there are no weapons, ammunition, firearms, combustibles and explosives, perishable vegetative or biodegradable substances including medical marijuana, food items, alcohol, illegal substances, or hazardous materials." In the state's view, the policy implicitly requires the arresting officer to open any closed container that is uniquely designed or objectively likely to contain dangerous items such as combustibles and explosives.

In reply, defendant asserts that, if the LCSO policy implicitly requires officers to open containers that are uniquely designed or objectively likely to contain dangerous items, then "it also requires them to open containers uniquely designed or objectively likely to contain perishable vegetative substances, biodegradable substances, medical marijuana, food items, alcohol, and illegal substances," and is, therefore, unconstitutionally overbroad. *See generally State v. Williams*, 227 Or App 453, 457, 206 P3d 269 (2009) ("An inventory policy that requires police to open all closed containers, regardless of whether they are likely to contain valuables, is overbroad.").

We begin with an overview of the law governing inventories. Article I, section 9, prohibits unreasonable searches. Unless a warrantless search falls within one of a few carefully delineated exceptions to the warrant requirement, it will be deemed *per se* unreasonable. *State v. Connally*, 339 Or 583, 587, 125 P3d 1254 (2005). An administrative inventory of a person's property (often, an impounded car or personal property seized from a person who is being taken to a secure facility) is a valid exception to the warrant requirement if it satisfies several conditions. *See id.* (describing circumstances under which officers may inventory property "consistently with Article I, section 9"). The inventoried property must be lawfully impounded. *State v. Atkinson*, 298 Or 1, 8, 688 P2d 832 (1984). The inventory must be "conducted pursuant to a properly authorized administrative program, designed and systematically administered so that the inventory involves no exercise of discretion by the law enforcement person directing or taking the inventory." *Id.* at 10. The person performing the inventory must not deviate from the established protocol. *Id.* The

scope of the inventory must be "'reasonable in relation to its purpose.'" *Weber v. Oakridge School District 76*, 184 Or App 415, 437, 56 P3d 504 (2002), *rev den*, 335 Or 422 (2003) (quoting *State v. Rounds*, 73 Or App 148, 153, 698 P2d 71, *rev den*, 299 Or 663 (1985)).

In serving the purposes of the inventory, the authorizing policy "must not permit police to indiscriminately rummage through closed containers * * *." *State v. Stone*, 232 Or App 358, 362, 222 P3d 714 (2009), *rev den*, 349 Or 654 (2011). Generally, "property is to be listed by its outward appearance; no closed, opaque container may be opened to determine what, if anything, is inside it so that the contents may be inventoried in turn." *State v. Ridderbush*, 71 Or App 418, 426, 692 P2d 667 (1985). We have recognized an exception to that rule: An inventory policy may authorize officers to open closed containers that are "designed to or likely to contain" valuable items. *Williams*, 227 Or App at 457; *see also State v. Cordova*, 250 Or App 397, 402, 280 P3d 1036 (2012) (invalidating an inventory policy that required officers to open all "'closed containers that *could* contain valuables'" (emphasis in *Cordova*)).

An inventory policy need not expressly direct the police to open closed containers. When an inventory policy specifically requires an officer to inventory valuable items, "we have determined that the policy implicitly *requires* [the] officer to open containers—such as wallets, purses, and fanny packs—that are uniquely designed or objectively likely to hold valuables, and that such a policy is constitutional." *State v. Taylor*, 250 Or App 90, 96-97, 279 P3d 254 (2012) (emphasis added). In those circumstances, the implicit requirement that officers open every closed container that is designed or objectively likely to contain valuables serves as the constitutionally necessary constraint on the exercise of individual officers' discretion. *See State v. Mundt/Fincher*, 98 Or App 407, 413-14, 780 P2d 234, *rev den*, 308 Or 660 (1989) (policy requiring inventory of all cash and negotiable checks implicitly required an inventory of every container designed or objectively likely to contain money or other valuables; such "guidelines effectively eliminate any discretion on the part of the booking officer about whether to inventory the contents of a wallet. * * * In other words, [the officer]

did not have discretion *whether* to inventory the contents of a wallet; he had been instructed to do so." (Emphasis in original.)).

We begin our analysis in this case by considering which inventory policy applies. As noted, defendant contends that the EPD policy applies because Molony and Willis were EPD employees, while the state argues that the LCSO policy applies, either because defendant was lodged at the LCACF or because EPD General Order 502.1(I)(A)(1) requires Eugene police officers to comply with all jail rules. We conclude that Molony and Willis were required to comply with both policies. EPD General Order 502.1 ("Detention and Booking of Prisoners") provides, in part:

"Part I - Responsibilities and Procedures for All Personnel

"A.   Lane County Adult Correctional Facility

"1.   You must comply with all jail rules and secure all weapons, including firearms, aerosol irritants, and batons before entering the security area.

"* * * * *

"4.   Handle the prisoner's property as outlined in General Order 601.4."

(Underscoring in original.) General Order 601.4 ("Safekeeping Storage of Prisoners' Property"), in turn, provides, in part:

"Part I - Responsibilities and Procedures for All Personnel

"A.   Use of lockers

"1.   Metal storage lockers are provided at the Lane County Jail * * * for storage of bulk property. * * *

"2.   Whenever possible, these lockers should be used to store a prisoner's property that is too large or otherwise inappropriate for storage inside the jail, rather than lodging that property at City Hall.

"3.   Do not store firearms, explosives, hazardous materials, perishables, or unusually valuable items in the lockers. * * *

"B.     <u>Storage procedure</u>

"\* \* \* \* \*

"2.     Inventory the property to ensure it does not contain one of the items listed in A-3, and fill out the safekeeping property report."

(Underscoring in original.)

It is self-evident that Eugene police officers performing their duties within the City of Eugene must adhere to the policies of the EPD. General Order 502.1 requires Eugene police officers both to handle prisoner property in accordance with General Order 601.4 and to obey all jail rules. Those rules include the inventory policy set out in LCSO Order 02.02.05(D)(5). That order requires officers to inventory prisoner property and ensure "that there are no weapons, ammunition, firearms, combustibles and explosives, perishable vegetative or biodegradable substances including medical marijuana, food items, alcohol, illegal substances, or hazardous materials." Although the EPD and LCSO policies do not overlap completely in what they require officers to look for while conducting an inventory, nothing in the policies prevents officers from complying with both.

The upshot is that, before storing prisoner property in the outdoor lockers at the LCACF, Eugene police officers are required to check the property for all of the items specified in General Order 601.4 and LCSO Order 02.02.05(D)(5). Because neither policy expressly addresses closed containers, that requirement extends to opening all closed containers that are uniquely designed or objectively likely to hold any of those items. *See Mundt/Fincher*, 98 Or App at 413-14 (if an inventory policy is silent on the handling of closed containers but requires that specified items be inventoried, the policy implicitly requires officers to open "*every* type of container designed or objectively likely to contain" those items (emphasis in original)).

As noted above, defendant argues that LCSO Order 02.02.05(D)(5) is "overbroad," as we have used that term in our administrative-inventory cases. We agree. Again, the general rule in Oregon is that an inventory policy may not

authorize the police to open all closed, opaque containers. *Ridderbush*, 71 Or App at 426. Although we have recognized an exception to that rule for containers that are designed to or likely to contain valuables, "[w]e have not extended that exception to containers that are objectively likely to contain weapons, drugs, or other contraband." *Taylor*, 250 Or App at 96-97. Nor have we *declined* to extend the exception; we simply have not had the occasion to decide whether other circumstances warrant its extension. We need not decide in this case whether preventing injury to police officers and jail employees warrants extending the exception to containers that are likely to hold dangerous items. To conclude that LCSO Order 02.02.05(D)(5) is valid, we would have to extend the exception to all of the items that the order requires officers to look for. That is, we would have to conclude that an inventory policy may constitutionally authorize officers to open closed containers to look for any of the things listed in LCSO Order 02.02.05(D)(5), including any food items and alcohol. We cannot do so.

As noted above, the scope of an inventory must be "'reasonable in relation to its purpose.'" *Weber*, 184 Or App at 437. When we described the inventory exception to the warrant requirement in *Mundt/Fincher*, we stated, "Because wallets or purses are primarily intended to be used to store valuables, it may be important to discover what is in them, both to protect the owner's property and to prevent the assertion of false claims against the police. Both are legitimate purposes for inventories of impounded property." 98 Or App at 412 (citation omitted). In this case, the LCACF booking sergeant testified that the jail inventory policy was intended to protect prisoner property, to protect Lane County against liability, and to protect the police officers and employees of the jail against hazards that may arise from uninventoried property. We are hard pressed to see how searching for food and alcohol serves those purposes. Nothing in the policy or the testimony about it establishes that necessary connection.[7]

---

[7] Because the inclusion of those items in LCSO Order 02.02.05(D)(5) renders the inventory policy overbroad, we need not determine whether requiring officers to remove any of the other specified items from stored property is reasonably related to the policy's purposes.

In short, the inventory policy set out in LCSO Order 02.02.05(D)(5) requires police officers conducting an inventory to look for a broad range of items, including food and alcohol, and thus to open all closed containers that are designed to or likely to hold *any* of those items. Such an inventory extends well beyond that which would be reasonably related to the stated purposes of the policy, which mirror those that we found permissible in *Mundt/Fincher*. In other words, the policy requires officers to open and inventory closed containers that are *not* designed to contain or objectively likely to contain valuables or even dangerous items. It follows that the policy is overbroad. "If an inventory policy is overbroad, an inventory conducted pursuant to that policy violates Article I, section 9." *State v. Cherry*, 262 Or App 612, 617, 325 P3d 813 (2014). Accordingly, the inventory of defendant's backpack violated the constitution.

We turn to the state's alternative argument. The state contends that the examination of the contents of defendant's backpack constituted a legitimate search incident to arrest. The state acknowledges that neither party raised that issue below and that the trial court did not rule on it, but it asserts that we may affirm the trial court's ruling under the "right for the wrong reason" principle.

We will affirm under the "right for the wrong reason" principle only if (1) the facts of the record are sufficient to support the proffered alternative basis; (2) the trial court's ruling is consistent with the view of the evidence under the alternative basis; and (3) the record is materially the same as would have been developed had the prevailing party raised the alternative basis for affirmance below. *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001).

A warrantless search is permitted incident to an arrest when, "taking into consideration all of the surrounding circumstances, the search is necessary to protect the arresting officers, to prevent the destruction of evidence, or to discover evidence related to the crime for which the defendant is under arrest." *State v. Newport*, 204 Or App 489, 493, 130 P3d 792 (2006). A search for evidence related to the crime of arrest must be reasonable in time, place,

and scope. *State v. Stock*, 209 Or App 7, 16, 146 P3d 393 (2006). The police may search closed containers "found on or immediately associated with the arrestee, but only when it is reasonable to believe that evidence of a crime for which the person was arrested could be concealed there." *State v. Owens*, 302 Or 196, 202, 729 P2d 524 (1986).

As detailed above, defendant was arrested in May 2011 on a warrant issued based on an indictment charging him with identity theft, forgery-related crimes, felon in possession of a restricted weapon, and possession of a burglary tool or theft device—crimes that the indictment alleged defendant had committed four months earlier. The permissibility of the search of the backpack incident to defendant's arrest for those earlier crimes turns in significant part on whether it is reasonable to believe that evidence of those crimes could have been concealed in the backpack.

The state contends that the facts in the record are sufficient to demonstrate that it was reasonable for Molony to believe that the backpack could have contained evidence of identity theft. The state notes that the arrest warrant stemmed from the evidence of identity theft that Willis had found in defendant's home four months earlier, that Molony arrested defendant a short distance from his home, and that defendant's wife told Molony that she had taken the backpack because she thought it contained illegal items. The state also asserts that the record is materially the same as it would have been had search incident to arrest been raised in the trial court. According to the state, the operative facts for that theory involve where and when the backpack was located, and the parties' arguments about the inventory theory developed those facts extensively.

Defendant responds that the record does not support the state's alternative theory. He asserts that Willis had seized the evidence of the crimes for which defendant was arrested when he searched defendant's home in January 2011, so it would not have been reasonable to "assume that defendant had somehow managed to preserve incriminating evidence from that search and was carrying it around four months later." Defendant also asserts that,

had the issue been raised below, he might have created a different record.

We need not decide whether the record as it stands supports the state's alternative argument. We agree with defendant that the record might be materially different had the issue been raised in the trial court. Defendant could have questioned Molony and Willis about whether suspects charged with identity theft and forgery-related crimes based on evidence seized from their homes are likely to have more evidence of those crimes. More pointedly, he could have questioned them about the likelihood of suspects carrying that evidence in a backpack four months later. The officers' responses might have demonstrated that it would not have been reasonable to believe that evidence of those crimes could have been concealed in defendant's backpack. Accordingly, we cannot affirm the trial court's denial of defendant's motion to suppress on the ground that the evidence was discovered in a valid search incident to arrest.[8]

Because the warrantless search of defendant's backpack was not conducted pursuant to a valid inventory policy and we cannot conclude that it was permissible under another exception to the warrant requirement, the evidence found in the backpack must be suppressed.

The question remains as to which of defendant's convictions we must reverse as a result. "Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]" OEC 103. Under Article VII (Amended), section 3, of the Oregon Constitution, we must affirm the trial court's judgment despite any error if there is "little likelihood that the error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003).

In Case Number 211111664, defendant was convicted of one count of interfering with a peace officer and eight counts of identity theft. Defendant does not challenge

---

[8] Because the record might have developed differently on the question whether it was reasonable to believe that evidence could be concealed in the backpack, we need not address whether the record is otherwise sufficient to satisfy the state's burden to show that the search was reasonable in time, place, and scope.

the conviction for interfering with a peace officer, but he argues that the identity-theft convictions were based directly on the evidence found in his backpack and therefore must be reversed. We agree.

In Case Number 201110047, defendant was convicted of two counts of identity theft and one count each of criminal possession of a forgery device, first-degree criminal possession of a forged instrument, felon in possession of a restricted weapon, and possession of a burglary tool or theft device. Those charges were based primarily on the evidence seized from defendant's home in January 2011. On appeal, defendant does not challenge the weapon and burglary-tool convictions. As to the remaining convictions, part of defendant's trial strategy was to suggest that other people who frequented his tattoo parlor could have perpetrated the identity-theft and forgery crimes and that the state had failed to prove beyond a reasonable doubt that he was involved. The prosecutor asserted in her closing argument to the jury that the evidence found in defendant's backpack in May 2011 refuted defendant's case. She highlighted the two checks from Clyde Green:

> "And, again, what's the significance of these? One's in the residence. One's in the backpack. You can't say this was somebody else doing all this stuff. It wasn't me. And then turn around and have a backpack full of stuff four months later. Even if you—even if you gave some credence to the argument that this was all being done by other people, when you get to the second search of the backpack, it just flies in the face. It makes absolutely no sense.

> "And with Clyde Green, he was listed as a payee [sic], and Detective Williams told you about that in the computer program. So there's evidence that he was going to take that information from those checks and use them to create new checks in the name of someone who is conveniently dead."

Defendant asserts on appeal that the prosecutor's argument "was a convincing one and likely influenced the jury verdict."

Again, we agree with defendant. The evidence in the backpack undermined defendant's assertion that someone else could have been responsible for the criminal activities that had been conducted in his tattoo parlor, which

officers discovered in January 2011. One of the identity-theft counts for which defendant was convicted was based on the discarded attempts to make a driver's license with defendant's picture and Gary Walker's name. The fact that defendant was carrying a completed version of that forged license in his backpack in May 2011 along with a number of other documents that belonged to Walker, including one with his driver's license number on it, made it less plausible that someone else had been responsible for the earlier discarded attempts. Defendant's possession of the forged license also strengthened the state's case that it was defendant, not someone else, who had been using his computer to forge checks, given that Gary Walker was listed as a payee in the check-writing program and that checks created on the computer were made payable to Walker. The forged license would have made it possible for defendant to cash those checks. The state's case was also strengthened by the fact that defendant was carrying a processed check from Clyde Green, whose name and banking information had been entered into the check-writing program on defendant's computer. Thus, the evidence in the backpack likely influenced the jury's verdict on possession of a forgery device (the computer), possession of a forged instrument (the Oak Leaf Property Management checks that were created on the computer), and the remaining count of identity theft (the Beauty Star Salon check, which was also created on the computer). Because we cannot say that there is "little likelihood" that the evidence in the backpack affected the verdict on those charges, the convictions must be reversed.

In Case Number A150288, Counts 1, 13, 14, and 15 reversed and remanded; otherwise affirmed. In Case Number A150289, Counts 2, 3, 4, 6, 7, 8, 9, and 10 reversed and remanded; otherwise affirmed.