JAMES, J., concurring.
In this case, involving the inventory search of an opaque container, the majority affirms the decision of the trial court upholding the search, relying on State v. Johnson , 153 Or.App. 535, 958 P.2d 887, rev. den. , 327 Or. 554, 971 P.2d 410 (1998). 289 Or.App. at 381, 410 P.3d at 387. I cannot find fault with that reasoning. I concur that our decision in Johnson does support the proposition that the search here was lawful.
However, the majority could reverse the trial court, relying on State v. Keller , 265 Or. 622, 629, 510 P.2d 568 (1973) and State v. Atkinson , 298 Or. 1, 7, 688 P.2d 832 (1984), although doing so would require us to disavow much of our *384 subsequent application of those cases. In that instance, I would also concur, because Keller and Atkinson support the proposition that the search was un lawful. And therein lies the problem. If this court's jurisprudence were an art museum, our decisions on inventory searches would surely hang in the impressionists wing, where patrons are not encouraged to inquire too closely, lest the illusion of a coherent picture be dispelled. How, and why, this came to be is worth examining.
Although its origins can be traced farther back, the modern inventory exception to the Fourth Amendment's warrant preference derives from South Dakota v. Opperman , 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). There, the Court grounded the exception in a tripartite policy rationale: "the protection of the owner's property while it remains in police custody, * * * the protection of the police against claims or disputes over lost or stolen property, * * * and the protection of the police from potential danger." Id. at 369, 96 S.Ct. 3092. See Illinois v. Lafayette , 462 U.S. 640, 643, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (applying the Opperman policy rationale to inventory searches of personal items at booking).
In Colorado v. Bertine , 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), the Court clarified that, to be reasonable under the Fourth Amendment, an inventory search had to be performed in accord with "reasonable police regulations relating to inventory procedures administered in good faith." Id. at 374, 107 S.Ct. 738. Discretion of where to search was permissible, so long as "the exercise of police discretion * * * is exercised according to standard criteria and on the basis of something other than suspicion of *389 evidence of criminal activity." Id . at 375, 107 S.Ct. 738. This includes the opening of closed containers during the inventory search, regardless of appearance. As the Court noted,
"When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between * * * glove compartments, upholstered seats, trunks, and wrapped packages * * * must give way to the interest in the prompt and efficient completion of the task at hand.
" * * * * *
*385 "A single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront."
Id . (citations and internal quotation marks omitted).
Three years after Bertine , the Court made explicit that the Fourth Amendment does not require any particular treatment of closed containers in an inventory policy. So long as the inventory policy is "not [a] ruse for a general rummaging in order to discover incriminating evidence," closed containers could be categorically searched, ignored, or approached on a case by case basis:
"Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors. The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment."
Florida v. Wells , 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).
For purposes of Article I, section 9, of the Oregon Constitution, inventory searches have received different treatment. In Atkinson , the court grounded the exception in the same tripartite policy rationale as Opperman . 298 Or. at 7, 688 P.2d 832. With respect to the first two parts of the rationale, the protection of the owner's property while it remains in police custody and the protection of the police against claims or disputes over lost or stolen property, the court largely tracked Opperman . Id. However, Atkinson departs from Opperman on the third rationale-officer safety. There, Atkinson noted that "[r]eliance on this reason must have a concrete basis in specific circumstances; it may not simply be assumed as a basis of a general precautionary practice." Id . at 8, 688 P.2d 832.
Perhaps because of this rejection of a categorical officer safety rationale, Article I, section 9, jurisprudence also rejects the categorical treatment of containers as expressed in Bertine and Wells . Atkinson held that, to be valid, the *386 "inventory must be conducted pursuant to a properly authorized administrative program, designed and systematically administered so that the inventory involves no exercise of discretion by the law enforcement person directing or taking the inventory." 298 Or. at 10, 688 P.2d 832. Atkinson went on to hold that, as a general rule, an inventory policy complying with Article I, section 9, cannot authorize the police to open closed containers; in the classic example, the police must inventory a closed fishing tackle box as "one fishing tackle box." Id . (quoting Keller , 265 Or. at 626, 510 P.2d 568 ).
Following Atkinson , the treatment of closed container inventory searches under Article I, section 9, can be delicately described as conflicted. In State v. Ridderbush , 71 Or.App. 418, 426, 692 P.2d 667 (1984), tacking true to the course set by Atkinson , we held that, as a general rule, police must inventory property by its outward appearance and may not open a closed, opaque container in order to inventory its contents.
But five years later, in State v. Mundt/Fincher , 98 Or.App. 407, 780 P.2d 234, rev. den. , 308 Or. 660, 784 P.2d 1102 (1989), we announced an exception to that rule where an inventory policy required the counting or recording of "cash, checks and other items of value typically found in a wallet or purse." 98 Or.App. at 413, 780 P.2d 234. In Mundt/Fincher , the applicable inventory policy required the officers to " '[i]ndicate the breakdown of all cash and negotiable *390 checks by coin, currency, and checks.' " Id . (quoting the inventory policy). We upheld that policy, despite Atkinson and Ridderbush , by claiming, without much explanation, that "[n]either a wallet nor a purse is a 'closed, opaque container.' " Mundt/Fincher , 98 Or.App. at 412, 780 P.2d 234.
In understanding how Oregon's inventory exception jurisprudence has evolved, it is critical to recognize the importance of Mundt/Fincher. Only by making that essential foundational holding-that wallets and purses were not closed, opaque containers-were we able to avoid the clear dictate of Atkinson that discretion to open such containers was impermissible. Yet, in large part, our inventory cases subsequent to Mundt/Fincher rely on language that followed that essential holding, where we said:
*387 "Because wallets or purses are primarily intended to be used to store valuables, it may be important to discover what is in them, both to protect the owner's property and to prevent the assertion of false claims against the police. Both are legitimate purposes for inventories of impounded property. Although other containers may also hold valuable property, wallets and purses are uniquely designed for that purpose."
Mundt/Fincher , 98 Or.App. at 412, 780 P.2d 234 (citations omitted).
But that language is a red herring. The first part is just a reiteration of the underlying policy rationales supporting inventory searches. The second part is dicta at best, distraction at worst. The fact that a container is "designed" for holding valuables is neither a distinction recognized by Atkinson or Keller , nor the basis of our holding in Mundt/Fincher . The true basis of our decision in Mundt/Fincher, the only way we could reach that result under Atkinson 's clear mandate, was to categorically classify a wallet and a purse as something other than a closed container. By categorizing a wallet or a purse as per se not a closed container, the issue became a simple one of discretion. "The guidelines obviously were phrased generally to require inventory of every type of container designed or objectively likely to contain money or valuables, including wallets." Mundt/Fincher , 98 Or.App. at 413, 780 P.2d 234 (emphasis omitted). As a result, we held, the officers did not have discretion whether to inventory the contents of a wallet. Id. at 414, 780 P.2d 234.
Within a decade, however, the actual holding of Mundt/Fincher was passed over and our decisions turned on whether a container was "designed" to hold valuables. In State v. Bean , 150 Or.App. 223, 229, 946 P.2d 292 (1997), rev. den. , 327 Or. 448, 966 P.2d 222 (1998), we held that a Gresham policy authorized the opening and inventorying of the contents of a fanny pack. There, we expanded upon Mundt/Fincher , which had dealt with items normally associated with holding currency, to holding that fanny packs were containers "intended primarily to store valuables" in a general sense, and, therefore, excepted from the Atkinson prohibition. Bean , 150 Or.App. at 229, 946 P.2d 292.
The culmination of this strange line of reasoning comes in Johnson . There, we applied the same principle to *388 a briefcase that, we noted, could function very much like a wallet or a purse, and could hold articles such as "money, credit cards, valuable papers, a lap top computer, or a calculator." Johnson , 153 Or.App. at 542, 958 P.2d 887. Such a container was, thus, neither closed nor opaque:
"Similarly, the briefcase and the coin purse in this case are not 'closed, opaque containers' because they are typically used to store valuables in the same way as a purse or a wallet."
Id . at 540, 958 P.2d 887.
Mundt/Fincher and Johnson are judicial alchemy, whereby this court transmuted objects that, to all commonsense observation were both closed and opaque, into objects that were treated, legally, as being the opposite: open and transparent. This brings us to the situation we find ourselves in today. Under our case law, a search conducted pursuant to an inventory policy can permit the opening of some closed containers, but not all. And whether a container can be validly opened is dependent upon the subjective assessment of whether that container is reasonably "designed" to hold valuables, as opposed to whether that container "could" hold valuables.
*391 State v. Cordova , 250 Or.App. 397, 402, 280 P.3d 1036 (2012). Briefcases, wallets, purses, fanny packs, and backpacks have been held permissible. In contrast, boxes, tackle boxes, and steamer trunks could not be opened. Coin purses found within a larger purse could be opened, but cosmetic bags were prohibited.
No attempt has been offered by this court to tie those varying results to the purported policy rationales underlying the warrant exception. What makes an inventory search "reasonable" under Article I, section 9, is purportedly its noninvestigatory purpose in securing and accounting for the valuable possessions of citizens, and to protect law enforcement against claims of loss. The distinctions we have created do little to further those goals, however. As any Oregon fisherman can attest, the contents of a tackle box can be very valuable indeed, yet an inventory search of it is prohibited. Whereas a clearly closed and opaque fanny pack is rendered open and transparent, lest we fail to account for the bottle of water and the tube of Chapstick.
*389 Further, if a foundational requirement for a valid inventory search under Article I, section 9, as expressed by Atkinson , is "no exercise of discretion" by law enforcement, our closed container jurisprudence injects discretion, rather than removes it. 298 Or. at 10, 688 P.2d 832. The policy at issue in this case, like many policies around Oregon, calls for the opening of closed containers "designed" to hold "other valuables." That creates two points of discretion.
First, the officer must exercise discretion in determining what is, or is not, an "other valuable." Here, the officer made the discretionary determination that a personal electronic item is an "other valuable." The fact that we now approve of that determination after the fact does not render it nondiscretionary. Rather, it simply means that this court, too, views personal electronics as valuables.
But in so doing, we offer no fixed standard of value. Is a $10 thumb drive an electronic device so as to constitute an "other valuable?" The inventory policy does not guide the officer, who will thus be forced to make a discretionary determination of value-a determination that some future court will adjudicate on a case-by-case basis. That is not a systematized policy that can be equally and universally applied. Rather, it is a policy of discretion, where what is worthy of inventory is determined by the subjective evaluation of the officer conducting the inventory-precisely what Atkinson prohibited.
Second, under this policy, once the officer exercises discretion to determine whether something is of value, he must then exercise discretion to determine if the closed and opaque container is one that is reasonably "designed" to contain the valuable. As we describe above, "[f]rom its outward appearance, the case looked to be a container for holding a small external computer hard drive or a small video game console, such as a Nintendo Game Boy." 289 Or.App. at 381-82, 410 P.3d at 387-88. On this record, it appears that neither the officer, nor this court, knows precisely what the container was designed to hold. It is apparently sufficient that it is designed to hold some electronic device.
Finally, the incongruity of our case law in this area is brought into sharp focus by one aspect of this case. When *390 it comes to electronic storage devices, like a hard drive, the value of the storage device itself is eclipsed by the true locus of value: the data . See, e.g. , State v. Mansor , 279 Or.App. 778, 792, 801, 381 P.3d 930 (2016), rev. allowed , 360 Or. 752, 388 P.3d 721 (2017) ("[P]ersonal electronic devices are more akin to the 'place' to be searched than to the 'thing' to be seized and examined."). Looking at the external black box of a hard drive tells one nothing about the value of the object, because the value of the object is determined by its invisible digital contents.
In holding that an inventory search of a closed, opaque container designed to hold a hard drive is permissible, when examining the physical hard drive tells one nothing about its internal value, whereas inventorying a steamer trunk, or a tackle box, is im permissible, when doing so would actually reveal their contents and value, our case law has reached discordance. This discord does not serve the purposes of Article I, section 9 ;
*392 citizens are left with an uncertain expectation of their privacy rights, and law enforcement is left with uncertain clarity as to what is, or what is not, a valid inventory search.
Despite these concerns, however, the majority is correct that our case law in this area supports the search in this case. To hold otherwise would require that this court disavow many of its prior decisions in this area. "[T]he principle of stare decisis means that the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent." State v. Ciancanelli , 339 Or. 282, 290, 121 P.3d 613 (2005). Neither party has asked us to do so here, and it would be inappropriate to approach that task sua sponte . Accordingly, I must concur.